# Richmond.

## THE GARDEN CLUB OF VIRGINIA v. VIRGINIA PUBLIC SERVICE COMPANY, ET ALS.

January 16, 1930.

Absent, Chichester and Epes, JJ.

660

The opinion states the case.

*Andrew D. Christian*, for the appellant.

*Hugh A. White*, for the appellees.

HOLT, J., delivered the opinion of the court.

This is an appeal from an order of the State Corporation Commission, dismissing for want of jurisdiction certain proceedings there instituted by the Virginia Public Service Company.

That corporation petitioned the Commission for permission to erect a dam in the upper entrance to Goshen Pass, that water might be impounded for the development of power. The Garden Club of Virginia,

as a party interested, intervened to protest, and the case came on to be heard upon its merits. At the hearing want of jurisdiction was suggested by the Commission itself. Trial on the merits was suspended and investigation was directed to that alone. After a painstaking and exhaustive examination, the Commission reached the conclusion that it had no authority in the premises, and dismissed the proceedings. Its reasons, together with every relevant fact, are set out in the opinion of Commissioner Epes, which is made a part of the record. From that opinion this appears:

"The Big Calfpasture river and the Little Calfpasture river rise in Augusta county, in the eastern ridges of the Alleghany mountains, on the western and eastern sides, respectively, of the Great North mountain, and flow in a generally southward direction between the ridges of the Alleghanies into Rockbridge county. Near the town of Goshen the Big Calfpasture turns eastward, and flows around the southern end of the Great North mountain to its confluence with the Little Calfpasture, just at the western base of the Little North mountain, one of the most easterly ridges of the Alleghanies. The stream formed by the junction of these two rivers is called North river. Just below the fork it breaks abruptly through Little North mountain into the valley lying between the Alleghanies and the Blue Ridge, and flows in a generally southeasterly direction along this valley until it flows into the James at Balcony Falls, where the James breaks through the Blue Ridge and flows on eastward to Chesapeake Bay.

"The water gap through which the North river flows through Little North mountain, known as Goshen Pass, is a narrow mountain gorge about three miles long, noted for its wild natural beauty, being especially

beautiful when the rhododendron along the river and mountain sides is in bloom.

"The North river, from the junction of the Calfpasture rivers for some miles below Goshen Pass, is a comparatively small, shallow, swift-flowing, rocky mountain stream of variable stream flow.

   \*     \*     \*     \*     \*

"There are two small streams, or runs, that flow into North river in the pass; but the stream flow at the lower end of the pass (Wilson Spring) is not very much greater than at the dam site.

"So far as is disclosed by the record and by the examinations made by this Commission, no part of the Big Calfpasture, the Little Calfpasture, or the North river, for some miles below Goshen Pass, is now, or ever has been, navigable by boats of any kind or even floatable in high water; nor is there any intimation by any party to these proceedings that these streams are, or ever have been, navigable or floatable.

   \*     \*     \*     \*     \*

"The original application was for a license to construct and operate a concrete dam about 450 feet long, which would raise the water at the dam sixty-three feet above the river bed, and the water in the reservoir to a level of 1,390 feet above sea level. Such a dam would back up water in the Big Calfpasture river a distance of 5.2 miles above its junction with the Little Calfpasture river, to a point above the main line bridge of the Chesapeake and Ohio railway near the town of Goshen, and in the Little Calfpasture a distance of 6.8 miles above its mouth. But to avoid the opposition of the Rockbridge Company, or possibly the added expense to which the applicant would be put because of damage to the property of the Rockbridge Company, the applicant amended its petition before the hearings on it began.

"The Rockbridge Company, a new Virginia corporation, which has been incorporated for the purpose of manufacturing woolen textiles, has purchased four tracts of land near the town of Goshen, along or near the spur track of the Chesapeake and Ohio Railway Company, hereinafter mentioned; and has contracted for the erection thereon of the buildings for a large manufacturing plant, which will, when completed, cost several million dollars. A part of this land which the Rockbridge Company has acquired and upon which it proposes to construct its plant is so located that it would be flooded by the waters of the Big Calfpasture river, if raised by a dam in Goshen Pass to the 1,390 foot level. While the record is not entirely clear upon the point, it would appear that though the land actually occupied by the proposed buildings of the Rockbridge Company would not be covered by the water in the reservoir when standing at the 1,390 foot level, yet the foundations of the proposed buildings would be seriously affected by the impregnation of the earth with water seeping from the reservoir, and would require a special and more expensive construction than otherwise. But if the water in the reservoir of the proposed dam should not be raised above the 1,380 foot level, the property and proposed buildings of the Rockbridge Company would not be affected by the proposed dam.

"Because of these facts the Rockbridge Company vigorously opposed the construction of the dam proposed in said original application. After some negotiations, the Rockbridge Company agreed with the applicant to withdraw its opposition if the applicant would so amend its application as to provide for the construction of a dam which would not at any point raise the water in the reservoir to a level above the 1,380 foot level.

"In pursuance of this agreement the applicant abandoned its original application and filed an amended application, in which it applies for a license to construct and operate, at the same location specified in its original application, a concrete dam approximately 450 feet long and 56.5 feet high, so constructed that it would raise the level of the water at the dam to a maximum height of fifty-three feet above the river bed, and the water in the reservoir to a level not exceeding at any point 1,380 feet above the sea level. The dam proposed in the amended application would back up water in the Big Calfpasture river for a distance of four and five-tenth miles and in the Little Calfpasture river for a distance of five and sevententh miles.

"Both the original and the amended application set forth that it is proposed to construct a power house on the west side of North river, at Wilson Spring, which is just below the southern end of Goshen Pass; and to conduct the water from an intake located at the eastern side of the dam, at the 1,350 foot level, to the power house through a concrete pressure conduit ten feet in diameter. According to the plans filed with the amended application, the total length of this conduit from the dam to the surge tank just above the power house at Wilson Spring will be 10,300 feet, all of which will be in tunnels through the mountain, except where it crosses from the east to the west side of the river gorge just below the big bend of the river in Goshen Pass, and about 5,000 feet below the dam measured along the line of the conduit. Here the conduit will be carried across the river gorge to the entrance of the tunnel on the west side of the river on a steel girder bridge and concrete piers. The exposed portion of the

conduit where it crosses the gorge will be about 370 feet long and seventy-five feet above the river bed.

      \*          \*          \*          \*

"The dam proposed in the amended application will provide an average static head of water above the turbines in the power house of 225 feet, and have a constant controlled capacity of 3,000 horse power, as compared with a constant controlled capacity of 3,340 horse power for the dam proposed in the original application, and as compared with 1,230 horse power which it is estimated is available for ninety per cent of the time from the uncontrolled flow of North river at this point.

      \*          \*          \*          \*

"State Highway No. 338, an unimproved road under State maintenance, which is the route from Lexington to Staunton and Covington, via the town of Goshen, runs through Goshen Pass, following the west side of North river, and then along the south side of the big Calfpasture river to the town of Goshen. The evidence shows that this road is used to some extent, at least, by automobiles passing from points outside of Virginia to Virginia destinations, and the reverse. The building of a dam such as is proposed in either the original or the amended application will require the relocation of the State Highway No. 338 through Goshen Pass, and for a part of the way up the Big Calfpasture river.

"There is also a county highway, which leaves State Highway No. 338 some distance above the forks of the Calfpasture rivers, crosses the Big Calfpasture on a bridge, turns eastward down the north side of the Big Calfpasture for some distance and then runs across the area between the rivers, crosses the Little Calfpasture at a ford, and turns northward up the east side of the Little Calfpasture. Several miles of this

county highway would have to be relocated if a dam such as is proposed in either the original or the amended application is constructed in Goshen Pass.

"However, the relocation of these two roads can be accomplished without the interruption of through traffic, though at some places detours will have to be used while the relocated road is being constructed.

"Near the town of Goshen there is a bridge which carries the tracks of the main line of the Chesapeake and Ohio Railway Company over the Big Calfpasture river. Interstate traffic is constantly being moved over this bridge. The base of the rails on this bridge and of the tracks for some distance on each side of the bridge is 1,405 feet above sea level. The bed of the Big Calfpasture under the bridge is approximately 1,385 feet above sea level; and the base of the fills for the approaches on both sides of the bridge is approximately 1,392 feet above the sea level. So while the dam proposed in the original application would back up water under this bridge, it would not raise it above the banks of the stream or within several feet of the base of the fills for the approaches to the bridge.

"From the town of Goshen there is a spur track of the Chesapeake and Ohio Railway Company, sometimes called the Goshen Branch, which runs down the south side of the Big Calfpasture river some two miles or more. Where this spur track leaves the main line the base of the rails is approximately 1,405 feet above sea level; but it runs down grade and for something like 4,500 feet of its length the base of the rails is between 1,385 and 1,390 feet above sea level. These 4,500 feet of this spur track would be flooded by water in the reservoir of the dam proposed in the original application, but would not be in any way affected by a dam raising the water in the reservoir no higher than

the 1,380 foot level. The evidence shows that during the twelve months ending March 31, 1929, 487 cars were shipped over the Chesapeake and Ohio Railway from this spur track to points outside of Virginia, and it would appear that some, if not all, of these cars moved over the portion of said spur track which would be flooded by water standing at the 1,390 foot level.

"It would further appear from the evidence that the majority of the raw wool which will be used by the Rockbridge Company at the plant it is now erecting along or near this spur track, will be wool imported from Australia; that some of the materials for the construction of the Rockbridge Company's plant will be received from points outside Virginia; that much of its product will be shipped out of the State of Virginia; and that said building material and raw material will be received on this spur track, and the products of this company shipped from this spur track.

"While the dam proposed in the amended application will not back the water up within a mile of the main line of the Chesapeake and Ohio Railway or flood or otherwise affect any part of said spur track, it will require practically the same relocation of State Highway No. 338, and said county road, as would be necessary in case of a dam being built in accordance with the specifications of the original application."

These facts are certified by the Commission.

The issue, by stipulation of counsel, is restricted and limited to a single point, which is: "Does the term 'waters of the State,' as used in section 1 of chapter 424 of the Acts of 1928, include the waters across which Virginia Public Service Company has applied for a license to construct a dam in this case? The applicant and William J. Ayers have entered into this agreement upon the understanding of the Garden Club

of Virginia that its contention in the Supreme Court of Appeals, that the foregoing question should be answered in the affirmative, will be limited to a contention that the North river at the point in question, constitutes 'any stream or part hereof in this State other than those mentioned in this subdivision (c) in which the construction of any dam or works as authorized by this act would affect the interests of interstate or foreign commerce.' "

The Commission is given jurisdiction over all "waters of the State." What are they?

The statute in judgment, section 1, contains this definition: "The term 'waters of the State,' as used in this act, shall mean, (a) any stream or that portion of any stream in this State which prior to the passage of this act has been declared navigable by any unrepealed statute of this State, or (b) any stream or that portion of any stream in this State, the bed of which is owned by the Commonwealth, or (c) those parts of streams or other bodies of water in this State which either in their natural or improved condition, notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids, compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows or rapids, and also any stream or part thereof in this State other than those above mentioned in this subdivision (c) in which the construction of any dam or works as authorized by this act would affect the interest of interstate or foreign commerce."

[1] Counsel for appellant concedes the correctness of so much of the finding of the Commission as held that portion of North river where the dam is to be

erected is not navigable, not owned by the State, and is not used, or suitable for use, in the transportation of persons or property in interstate or foreign commerce, and that it has no jurisdiction by virtue of clauses (a), (b), or (c), unless it be in the concluding part of clause (c) for convenience here designated as (d). They base their contention for jurisdiction upon it which covers "any stream or part thereof in this State other than those above mentioned in this subdivision (c) in which the construction of any dam or works as authorized by this act would affect the interests of interstate or foreign commerce, * * *;" and contend that the petitioner had no right to change the height of its dam and water level from that contemplated in its original application because of section 5 of the water power act, where it is said: "If the Commission shall be of the opinion from all the evidence before it that, in pursuance of the herein expressed policy of the State to encourage water power development, the plans of the applicant provide for the greatest practicable extent of utilization of the waters of the State for which the application is made," etc., it shall grant applicant's petition.

The purpose of this last provision is patent. It was designed to prevent pre-emption of dam sites taken to forestall competition, to prevent speculation and to force present adequate development which without such safeguards might be retarded rather than promoted.

■ It is to be observed that practical considerations enter into the extent of the development required. In the instant case a dam from hilltop to hilltop would give the greatest possible power, but would make necessary construction and condemnation so extensive and expensive as to render the venture

unattractive. In other words, a 1,390 foot water level seems to be concededly reasonable, although there is no magic in these figures. They do not demand that it be raised to a 1,400 foot level, but say that a 1,380 foot level violates the statute. At 1,390 feet there is available 3,340 horse power, and at 1,380 feet, 3,000 can be developed. To secure this additional 340 horse power, the applicant ran the risk of materially interfering with the plant of the Rockbridge Company, whose enterprise contemplates the expenditure of "several million dollars" in buildings. That plant vigorously contested the original plan, and to remove objections entirely reasonable the water level was reduced ten feet. It was a practical solution of a real difficulty and we see nothing to criticize in it. Certainly the appellants could not, in reason, have claimed that the dam should have been a few feet higher than originally designed when such an increase would have flooded the village of Goshen, and for the same reason it cannot complain of reasonable reductions in a level which bid fair to affect the foundations of its chief industry.

From all of this it is manifest that the change in level was made for proper purposes and was not made to cut away jurisdiction which had theretofore attached.

This brings us to the amended application. As amended, backwaters will not touch the Chesapeake and Ohio railway's main track or any of its spurs It will not affect the plant of the Rockbridge Company, and reduces the appellants to this extremity— to the claim that the relocation of State Highway No. 338, an unimproved road through the pass, would affect the interest of interstate or foreign commerce, and this because automobiles from other States pass

over it. The Commission has certified that beyond possible detours during a period of relocation, traffic, such as it is, would not be interrupted, which ends this claim and case. As a matter of fact, the State may open, relocate or close its highways at pleasure, and those who visit us in automobiles have no constitutional privileges at stake.

If we assume that the applicant is tied to the 1,390 foot level, then it is said that interstate and foreign commerce will be affected in this wise: "(1) It will require the relocation of highways now used to some extent for interstate automobile travel; (2) it will back up water against the abutments of a main line bridge of the Chesapeake and Ohio railway over the Big Calfpasture river, over which interstate trains pass; (3) it will flood for approximately 4,500 feet a spur track of the Chesapeake and Ohio Railway Company from and to which interstate traffic moves, and export and import traffic will probably move in the near future; and (4) it will affect the flow of the water in James river, which is navigable and used for interstate transportation."

It is further contended that this brings it within the purview of section 1 of the water power act, and particularly under what, for convenience, has been designated as subsection (d), namely: "Any stream or part thereof in this State other than those above mentioned in this subdivision (c) in which the construction of any dam or works as authorized by this act would affect the interests of interstate or foreign commerce." To support which this claim is made: It is said that section (c), with certain eliminations of superfluous matter, would read as follows: "* * * those parts of streams * * * used or suitable for use for the transportation of persons or property in inter-

state or foreign commerce. * * * and also any stream * * * other than those above mentioned in this sub-division (c) in which the construction of any dam or works as authorized by this act would affect the interests of interstate or foreign commerce;" and that since the first paragraph deals with streams suitable for or used for water transportation, the second paragraph must, under a familiar canon of construction, deal with some other situation or be meaningless, from which it is argued that it must apply whenever land-borne, foreign, or interstate commerce is affected.

This is not necessarily true, and may be aptly illustrated by the facts in the instant case. Section (c) governs the situation in the pass itself and in the river bed just above, where no water-borne commerce is or ever will be. Suppose the James river canal had been extended from Lexington to the mouth of the pass. It is entirely possible that the construction of the dam at its Goshen end would have interfered with its operation at times, although the water, when it was returned to the river, would have been returned below the pass and above the head of navigation. In such circumstances, the construction of this dam might affect water-borne interstate or foreign commerce and bring the issue here under the jurisdiction of the Commission, and the same situation might arise were a dam built across a stream not navigable but tributary to one which was. Conditions like these would make subsection (d) as construed by the Commission far from meaningless. This criticism of its finding is unmerited.

▉ Moreover, the plain purpose of this entire act was to encourage water power development in the State, there so expressed in terms. The principles contended for would hamper that growth and would at

times impose impossible burdens. One who wished to build an ordinary grist mill might have to prepare the same preliminary surveys, or surveys of the same character, required from some great hydro-electric plant. The legislature could have had no such purpose in view. Moreover, a reading of the entire water power act, and it is elaborate in its detail, indicates to us that the only traffic contemplated whose interruption might necessitate the Commission's judgment was water-borne, was that possible on the "waters of the State." This is a possible construction, it is a reasonable construction, and "in any appeal from a judgment of the State Corporation Commission, it is to be remembered that its findings are to be treated as *prima facie* just, reasonable and correct—made so by express constitutional mandate, subsection (f), section 156 of the Constitution. *Norfolk Southern R. Co.* v. *Commonwealth, etc.,* 141 Va. 179, 126 S. E. 82." *Petersburg, H. & C. P. Ry. Co.* v. *Commonwealth,* 152 Va. 193, 146 S. E. 292, 294.

In this proceeding, the State Corporation Commission was of opinion that it was without jurisdiction. We think it was right in this, and that is the only question before us for decision.

The order appealed from must be affirmed, and it is so ordered.

*Affirmed.*