# Richmond.

## PETERSBURG, HOPEWELL AND CITY POINT RAILWAY COMPANY v. COMMONWEALTH OF VIRGINIA, AT THE RELATION OF THE STATE CORPORATION COMMISSION.

January 17, 1929.

Absent, Chichester, J.

The opinion states the case.

*Samuel W. Zimmer*, for the appellant.

*Shewmake & Gary* and *John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorney-Generals*, for the appellee.

HOLT, J., delivered the opinion of the court.

This is an appeal from an order of the State Corporation Commission granting a certificate of public convenience and necessity to the Southside Transportation Company, Incorporated, for the operation of motor vehicles in furnishing passenger service between Petersburg and Hopewell, Virginia, limited to three round-trips daily, taken by the respondent, petitioner here, which operates an electric line between those cities.

Petersburg is situated on the Appomattox river, at the head of navigation. It has about 35,000 inhabitants and is one of the oldest cities in Virginia. Hopewell is her youngest, and is located at the junction of that river and the James. Its corporate limits are seven or eight miles distant from those of Petersburg. In 1914 large munition works were established there. By 1916 there were employed in their operation around

30,000 people, and it had become an incorporated city with a population approximating 50,000. Immediately following the cessation of hostilities, on November 11, 1918, this munition plant ceased operation and was dismantled, and the population decreased even more rapidly than it had grown. By January, 1919, scarcely 3,000 remained. Since that time other industries, attracted by the location, have been established and it has again grown to be a city of from 12,000 to 15,000 inhabitants, with good prospects for continued progress. In such circumstances, the operation of a bus line ˙between these communities might well be taken as a matter of course, and so the application, which is the subject matter of this proceeding, was made.

At this time, in addition to the electric line, Hopewell has water transportation and a State concrete highway from Petersburg. From there also goes a branch of the Norfolk and Western Railway, and lately the Interstate Commerce Commission has authorized a subsidiary of the Seaboard Air Line Railway to build into it. In Petersburg, respondent's interurban line ends at the corner of Wythe and Sycamore streets. Its Hopewell terminus is in the main office of the Tubize Artificial Silk Company of America. In addition to the interurban line, it operates a local one in Hopewell which runs from the western portion of that town, known as DuPont City, through its business center on Broadway avenue to City Point.

This bus company gives motor vehicle service between Suffolk and Petersburg, Franklin and Petersburg, Weldon, N. C., and Petersburg, South Hill and Petersburg, Matoaca, Ettricks and Petersburg, and local service within Petersburg. Its Petersburg terminal is on West Tabb street, about a block from Sycamore. The electric line runs from its terminal

eastwardly along Wythe street to the corporate limits. The bus line, as proposed, runs from its Tabb street station one block east to Sycamore street; thence one block northwardly along Sycamore street to east Bank street, thence eastwardly along east Bank street to the city limits, where the concrete highway begins.

At a point on the concrete highway approximately 1,000 feet from the corporate limits of Petersburg, the right of way of the electric line is immediately adjacent to that highway, and for a distance of approximately 18,000 feet eastwardly continues so till Rosewood church is reached. Here it bears slightly to the north and runs eastwardly for about 10,000 feet and practically parallels it at a distance of about 500 feet until it bears to the south and crosses the highway. From this crossing eastwardly the right of way and the highway run together for about 2,000 feet. The highway then bears slightly to the north and the railway company slightly to the south for about 2,200 feet until the corporate limits of Hopewell are reached. At this point they are about 500 feet apart. The concrete road then bears to the north and then east, traversing that part of Hopewell north of the Norfolk and Western Railway, while the electric line turns east and then north through Hopewell, passing through that part of the city south of the Norfolk and Western Railroad until they both meet again at the terminal of the railway company, which is near the center of the city.

That part of Hopewell which lies north of the right of way of the Norfolk and Western Railway Company, and which is traversed by the highway, is likewise traversed by the local Hopewell line of the electric company, and this local line and the highway serve practically the same territory until they reach Broadway avenue. When the eastern end of that avenue is

reached the bus line bears south to the Hummel-Ross plant and the electric line north to City Point and James river.

The terminals of these companies in Petersburg are between three and four blocks apart, and both lines leave that city in the same general direction. As the situation now is, the bus line brings passengers from Ettricks and Matoaca and intervening points to its Tabb street station. They then have to walk three or four blocks to the electric station. If the bus line is established, they would simply transfer from one bus to another, that is to say they could do this three times a day and on other occasions they would still have to walk to the electric line. The bus line would also serve locally about ten city blocks from its terminal to the corporate limits on the east. There would here also be but three trips a day and people living along this line would still have to take the electric line if they went at other times. It is within easy walking distance.

Between Petersburg and Hopewell substantially the same territory is covered and this is also true in that city itself, save that the bus line alone reaches the Hummel-Ross plant. There are seventy-five people who live near it, and there are twenty-three white people and fifty negroes who work there and live in Petersburg. Measured by the labor tickets sold by the electric line, from 300 to 325 laborers live in Petersburg and work in Hopewell, although there are many who travel by automobile, and so their number is unknown and has not been approximated.

Six hundred and thirty-four citizens have requested the Commission to grant the necessary certificate to the bus company, while the City Council and Chamber of Commerce of Petersburg, and the Council and Hopewell Manufacturers' Association of Hopewell have

placed themselves on record as opposing any such grant.

The service now rendered by the electric line is all that could be reasonably asked. On Mondays, Tuesdays, Wednesdays, Thursdays and Fridays, thirty round trips are made. Twenty-eight are made on Sundays, and on Saturdays cars run at twenty-minute intervals.

The proposed bus schedule calls for three round trips a day. A twenty-one passenger bus is to leave Petersburg at six in the morning and at two and six in the afternoon. Its running time is thirty minutes. That of the electric line is thirty-five or forty minutes. The bus line charges for a straight trip thirty cents. The car line charges twenty cents and sells six round-trip tickets for $1.50.

No complaint is made of the service now given. As might be expected in an industrial community, the cars are somewhat crowded when one shift of laborers goes on and another shift comes off. At other times, traffic is light. In the flush times of war operation was profitable, but, as the following table shows, of late its receipts has steadfastly diminished.

1920, gross receipts, $149,197.63
1921, gross receipts, 116,144.73
1922, gross receipts, 110,569.99
1923, gross receipts, 102,917.91
1924, gross receipts, 88,722.46
1925, gross receipts, 86,744.52
1926, gross receipts, 85,844.83

In any appeal from a judgment of the State Corporation Commission, it is to be remembered that its findings are to be treated as *prima facie* just, reasonable and correct—made so by express constitutional

mandate, subsection (f), section 156 of the Constitution. *Norfolk Southern R. Co.* v. *Commonwealth, etc.,* 141 Va. 179, 126 S. E. 82.

■ Stress has been laid upon the pecuniary hardships which this additional competition will impose upon the respondent. The bus company is authorized to make, with a twenty-one passenger bus, three round trips a day. This service cannot be increased without permit, and one of the Commissioners has placed himself upon record as being unwilling to permit any extension of service until conditions have materially changed. It follows, therefore, of necessity, that little harm is possible at this time and this is made still more apparent when we consider the differences in the charges for service offered.

■■ If we were to concede for the sake of argument that the operating income of the electric line would materially decrease, this would not of itself be sufficient to warrant any modification of the Commission's order. Whatever may be the policy of the Interstate Commerce Commission, Virginia has seen fit to neither curtail nor forbid competition between transportation companies, and this was the law when the electric line was built. Investors took their chances.

■ The only limitation on competition is that written into the motor vehicle law, chapter 161, Acts of the General Assembly of Virginia, 1923 (Extra Session), page 195. There, in section 3, new permits are forbidden when public convenience and necessity are already reasonably served. Public convenience is always the paramount consideration. For unnecessary duplication of transportation facilities the public ultimately pays. "Shoestring" competition, in the end, hurts everybody.

■ Charters under our Constitution, section 154, are no longer matters of grace, but issue under general law. Railroads may parallel each other at pleasure (section 156 of the Constitution), and those who desire to build them may obtain permission without let or hindrance. Code, section 3856. The State is under no obligation to protect the car line, or to see that its operations are financially successful. Of course, no one wishes to see it fail, for its success would redound to the benefit of the entire community which it serves, and it has been, and is, of public service.

Its straits are due indirectly to the increasing competition of private cars, which can be neither regulated nor controlled. Every older form of transportation has felt its pinch. The promise of relief depends upon the growth of Hopewell, to which easy flow of traffic must always in some degree contribute.

■ In section 3 of the motor vehicle law it is said: "No motor vehicle carrier shall hereafter operate for the transportation of persons or property for compensation on any improved public highway without first having obtained from the Commission, under the provisions of this act, a certificate declaring that the public convenience and necessity require such operation;" and "that the existence of a railroad or other motor vehicle carrier in the territory sought to be served by such applicant shall not be sufficient for the refusal to grant a certificate but may be considered by the Commission as constituting good cause for limiting the number of vehicles which applicant may operate on the route mentioned in his application   *   *."

In commenting upon this statute, the Commission, in an opinion filed as required by law, has well said: "It is manifestly clear from the law above set forth

that the Commission cannot deny an application asking for a certificate of public convenience and necessity solely because a railroad operates within such territory, or because such operation may be in competition therewith, but may, in its discretion, limit or restrict the number of trips to be operated. The Commission in this case has thus used its discretion, and took into consideration the existence of a rail carrier, and granted a certificate limited to three round trips daily. Before any additional number of trips can be operated under this certificate, such certificate holder will have to establish that the public convenience and necessity requires such additional service."

What is meant by "public convenience and necessity?"

*In Re J. A. Towns*, 10 Va. Law Reg. (N. S.), page 498, the Corporation Commission cited with approval *In re Walter M. Aldrick*, decided by the New York Public Service Commission on October 5, 1922, and reported in P. U. R., 1923A, at page 385, where it was said: "So here, the word 'convenience,' as connected with the word 'necessity,' is so connected, not as an additional requirement, but to modify and qualify what might otherwise be taken as the strict significance of the word 'necessity.' And to analyze and give each word a separate meaning would be the same sort of 'extraordinary departure from the usual course' spoken of by the learned Chief Justice as to result in giving a wholly meaningless prefix to 'a word of rigor and strictness.' In the phrase 'public convenience and necessity' the word 'necessity' means that which is needful, essential, requisite or conducive to 'public convenience.' When more convenient and adequate service is offered to the public, it would seem that necessity requires such public convenience should be served. (*Re Rochester, Corning, Elmira Traction Co.*,

118 App. Div. 521, 102 N. Y. Supp. 1112; *Re Troy Auto Car Co.*, 11 N. Y. Off. Dept. R. 420, Case No. 6939; 31 N. Y. Off: Dept. Reports.)"

The New York Commission had again occasion to consider this subject *In Re International Bus Corporation*, decided September 1, 1926, and reported in P. U. R. 1927A, page 346, where it was said: "The opposition of the New York Central and Lehigh Valley railroads' is based upon the ground that the facilities afforded by their respective steam railroads and the electric railroad of the international are adequate to properly care for all demands for transportation between Buffalo and Niagara Falls, and that no public convenience or necessity will be served by an extension of those facilities. The petitioner concedes that the above mentioned facilities are amply sufficient to adequately and reasonably serve all demands for transportation by those who wish to travel by railroad, but asserts that there is an insistent and increasing demand on the part of the public for bus instead of railroad transportation.

"It is apparent from the record in this case that there is a demand for the service which the petitioner proposes to give and that such service will be convenient for the public use."

In the instant case, the Commission, in the course of its opinion, said:

"This Commission has heretofore granted certificates of public convenience and necessity to operate motor vehicles for the transportation of persons for compensation between Norfolk and Virginia Beach, Newport News and Hampton, Richmond and Hopewell, Richmond and Petersburg, Roanoke and Salem, and Alexandria and Washington, D. C. In all of these cities, except between Richmond and Hopewell, there is

electric railway service being offered to the public, which is either paralleled by motor vehicle service, or motor vehicles are being operated in the same general transportation territory, and were served by electric and steam railway facilities at the time motor vehicle service was inaugurated.

"In the cities of Richmond, Norfolk, Roanoke, Petersburg and Portsmouth motor vehicle service is being offered to the public daily over its streets in close proximity to that of the electric railway service. In Richmond, Norfolk and Portsmouth electric and motor vehicle service is rendered by the same owner and under the same management. It is quite clear that this company sensed the condition of the times, and properly decided to offer to the public this new mode of transportation that it might the more adequately meet the transportation requirements of the public served by it."

██ ██ The ability to carry in some manner all who apply for passage is not necessarily the touchstone. It was pointed out in the *International Bus Corporation Case* that it is sufficient if there is a public demand for bus service in preference to other means of transportation. It was already easily possible to carry from Buffalo to Niagara Falls all who wished to go, and the controlling consideration was public preference for bus service. When people generally wish to travel in this way, they should be permitted to do so, and it is no sufficient answer to say that other carriers, in other ways, stand ready to give the necessary service. That many people do entertain such preference is a matter of common knowledge. Bus lines parallel almost every railroad in the State, and have taken over much of their local, and some of their long-distance, traffic. This must have been, in part at least, the cause which

led the State Corporation Commission of Virginia to authorize automotive service between Newport News and Hampton, Roanoke and Salem, and Alexandria and Washington, where conditions in many respects approximate those of the case in judgment. Convenience and necessity, as those words are used in the statute, carry with them a certain elasticity of meaning, which, in other circumstances, does not always attach. Silk is a necessary article of wearing apparel, although with cotton, linen and wool we can be tastefully and comfortably clothed.

We have to concede that, in industrial development, the law of the survival of the fittest is not to be gainsaid. Stage coaches and canals were in many instances a total loss, made so by railroads, which in their turn clashed with interurban electric lines, and now both are facing the automobile in its varied forms. *Booth's Case*, 10 Va. Law Reg. (N. S.) 24. Should the time come when airplanes are preferred by a substantial part of the public, this preference, in its turn, will have to be heeded. They, too, will have then become a necessary public convenience, not to be put aside because buses can carry all who wish to go.

Public necessity does not rest upon service to be rendered to those who live along east Bank street, or who work at the Hummel-Rose plant, but grows out of preference which the people at large in these two cities have for automotive transportation, and there is positive testimony in the record tending to show that such preference exists.

It is next said that the bus company has no right to operate along the streets of Petersburg and Hopewell without the permission of these municipalities, and that such permission has not been given by them.

In *Norfolk Southern R. Co.* v. *Commonwealth, etc., supra,* the court had occasion to consider a somewhat similar objection. Speaking through Judge West, it said: "Section 124 of the Constitution was ordained primarily for the protection of the cities and towns of the State. The applicant's petition states that it is proposed to operate the bus line a distance of four and nine-tenths miles in the city of Norfolk, and two and one-tenth miles in the town of Virginia Beach, yet neither of these municipalities is here complaining of the action of the Commission in the instant case. Besides, the order of the Commission now under review grants the petitioner a certificate for the operation of motor vehicle carriers 'between Norfolk and Virginia Beach, Virginia.'

"In these circumstances, further discussion of assignment No. 5 would be unprofitable."

These municipalities are not parties to this proceeding, and so, likewise, a discussion of their rights would be unprofitable.

Finally, it is said: "That the Commission erred in treating only as petitions of intervention certified copies of resolutions adopted by the councils of Petersburg and Hopewell, protesting against the granting of a certificate to the motor vehicle carrier upon the ground that the public convenience and necessity are already being reasonably served by the railway company, as such resolutions are *prima facie* evidence for any purpose for which the original resolution could be received."

We are unable to see the force of this objection. These petitions and the resolutions filed on behalf of the electric company were all before the Commission, and doubtless were considered by it. All stand upon the same footing. As evidence, they are not very

valuable, but they do, in a general way, tend to show how the application was regarded. We have already had occasion to refer to the testimony of witnesses who circulated the petitions. Their statement, in substance, is that the establishment of the bus line met with hearty public approval.

██ After all, it is to be remembered that these matters are peculiarly within the province of the State Corporation Commission. Among its other duties, it was vested with the supervision of transportation by common carriers and vested also with wide discretion. Its judgments are presumed to be correct, and that presumption in this case has not been overborne.

The order appealed from must be affirmed, and it is so ordered.

*Affirmed.*