# Richmond

## SEABOARD AIR LINE RAILROAD COMPANY V. COMMONWEALTH OF VIRGINIA, ET AL.

June 16, 1952.

Record No. 3980.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Eppa Hunton, IV, Charles T. Abeles* and *Walter C. Scott, Jr.,* for the appellant.

*Oscar L. Shewmake* and *John C. Goddin,* for the appellees.

MILLER, J., delivered the opinion of the court.

The Seaboard Air Line Railroad Company, hereinafter called Seaboard, made application to the State Corporation Commis-

sion for a certificate of public convenience and necessity authorizing it to operate as a common carrier of property (freight and express) by motor vehicle between Norfolk-Portsmouth, Virginia, and the Virginia-North Carolina state line near Branchville, Virginia.

The route over which Seaboard applied for permission is thus set out in its application:

"From Portsmouth over U. S. Highway 58 to junction with Va. Highway 35, thence over Va. Highway 35 to junction with Va. Highway 195, thence over Va. Highway 195 to Va.-N. C. State Line; also from junction of Va. Highway 35 with Va. Highway 673 to Newsoms."

The service proposed would be operated in each direction daily, except Saturdays and Sundays, by truck leaving Portsmouth at 6 A. M. and arriving at Branchville at 9:36 A. M. In the opposite direction the vehicle would leave Branchville at 10:56 A. M. and arrive at Portsmouth at 2:40 P. M.

Notice of this application was given to public officials in the cities, towns and counties through which the proposed route would pass and to the common carriers serving that area. Three certificated common carriers of freight by motor vehicle, *i.e.*, Estes Express Lines, Wilson Trucking Company, and Ruby Nelms, trading as Smithfield Lines, each of which operates over part of the proposed route and renders service in that territory, appeared in opposition to award of the certificate. After hearing the evidence bearing upon whether or not public convenience and necessity required this supplementary service, award of the certificate was refused, and from that order Seaboard appealed.

Seaboard operates a steam railroad from Norfolk-Portsmouth to Branchville, Va. This line of railroad then extends on from Branchville to Norlina in North Carolina where it connects with Seaboard's main line railroad which runs from Richmond, Virginia, to Norlina, and thence on southwardly to Henderson, N. C., and other points. In addition to Seaboard's freight stations at Norfolk-Portsmouth and Branchville, it maintains and serves intermediate freight stations along this road, between Portsmouth and Branchville, at Bowers, Magnolia, Suffolk, Carrsville, Franklin, Newsoms and Boykins.

The proposed motor transportation which Seaboard seeks to inaugurate would be co-ordinated with its rail service and be

auxiliary and supplemental thereto. That is, if granted the certificate, Seaboard proposes to transport only its *less-than-carload* intrastate shipments by motor vehicle but on rail bills of lading and at rail rates and tariffs. It would receive, transport and deliver this freight and express now carried by rail, along with such additional shipments from other patrons, if any be obtained, to and from its freight stations on its rail line between the designated termini. In other words, all less-than-carload intrastate freight and express offered to it for transportation to and from its railroad stations in the towns and cities mentioned would be transported by truck.

The highway route over which Seaboard desires to operate closely parallels its road bed between Portsmouth and Branchville, with the exception of where the proposed route passes through Courtland, Virginia. But Seaboard does not ask to serve that town for it is not on its rail line. The distance from Portsmouth to Branchville along the highway is 74 miles. Of this proposed route about 51 miles thereof is now served by Estes Express Lines, which holds a certificate allowing it to operate as a freight carrier from Norfolk-Portsmouth along route 58 to Courtland, and thence on westwardly to other points. Objector, Wilson Trucking Company, operates as a certificated common carrier of property from Norfolk-Portsmouth over Highway 58 to Suffolk and thence on northwestwardly to Richmond. The third objector, Smithfield Lines, is certificated to operate from Norfolk-Portsmouth by way of Driver, Va., to Suffolk, Va., and so traverses in part the route over which Seaboard proposes to operate. The only points on Seaboard's proposed route not now served by certificated motor carriers are the small towns of Newsoms, Boykins and Branchville, all of which are comparatively near the North Carolina state line and have Seaboard's rail service.

Between Portsmouth, Va., and Norlina, N. C., Seaboard now operates one daily through freight train and one daily local freight train each way. All less-than-carload freight and express moving to and from its several stations between Portsmouth and the North Carolina state line is handled on the local freight trains.

If awarded the certificate, Seaboard says that it contemplates handling and transporting only the less-than-carload freight and express shipped to and from its stations along the proposed

route. Full carload shipments will continue to be transported by rail. According to Seaboard, the proposed operation, if put into effect, would "relieve the trains entirely from handling less-car-load freight" and would "eliminate all stops (of the local freight train) solely for the loading and unloading less-carload freight." These less-than-carload intrastate shipments now amount to an average of about forty-one tons per month.

The volume and character of the freight, the station or stations to which shipped, the number of stops made, the cars available and used and the amount of switching and other work required often tends to retard prompt delivery by rail, and at times these circumstances render it necessary to back-haul certain cars or let them lie over until the next day, thus delaying the arrival and delivery of shipments.

It appears from the testimony that transportation of these less-than-carload shipments by motor vehicle would advance delivery at various stations and quite often provide daily instead of intermittent service. At times it would expedite delivery at some stations by as much as a day. The use of trucks would also release from service some railroad cars for use other than as now employed. Seaboard's local freight trains would continue to operate, yet elimination of the frequent stops incident to carriage of less-than-carload shipments would permit its schedules to be improved, hasten the movement of cars, and so result in expediting to some extent carload shipments of freight along the line.

Motor vehicle transportation would also reduce some operating expenses that are now incurred. The estimated savings in train operating time and in car use would bring about an annual reduction of approximately $2,800 in expenses incurred on the service from Norfolk-Portsmouth to Henderson, N. C.

It is, however, significant that no shipper or receiver of freight, or any other party within the area sought to be served, has appeared to express a preference or desire that this service be inaugurated. Nor has any such person intimated in any manner that the present service along the route or in the area is inadequate or that public convenience and necessity require this supplemental service.

The right has been granted to Seaboard by the Interstate Commerce Commission to operate motor vehicles in interstate transportation of freight and express to and from its stations

between Norfolk-Portsmouth, Va., and Norlina and Henderson, N. C. Like authority for intrastate transportation of property by motor vehicle to and from its stations along this line within North Carolina has also been awarded to Seaboard by that state. Under these permits or certificates, it now engages in the carriage of property by motor vehicle in interstate commerce to and from its stations on this line in Virginia and in North Carolina, and it engages in the transportation of intrastate shipments along the line within North Carolina. The service now sought to be inaugurated in Virginia would be accomplished by transportation of freight and express on the same trucks now used and on such additional equipment as might be necessary.

During the proceedings before the State Corporation Commission, Seaboard expressed unwillingness to accept a certificate limited to that part of the proposed route which is not served by any certificated carrier, i. e., Newsoms, Virginia, to the North Carolina state line.

Seaboard also says that it would be expensive, and impracticable for it and the present certificated carriers to attempt to render a co-ordinated service by use of each other's facilities. It asserts that performance of the necessary operating details to render the proposed service satisfactory and economical demands that it exercise exclusive supervision and control over the contemplated undertaking. It is unwilling to attempt such co-ordinated service along this line.

The objection of Estes Motor Lines and the other two carriers to award of the certificate is two-fold. They contend (1) that the statute does not authorize the Commission to grant a certificate of this character which is auxiliary and supplemental to the rail service now rendered, and (2) that the evidence falls short of proving that public convenience and necessity requires its issuance. For these reasons objectors assert that the order of the Commission should be affirmed.

The legislative acts authorizing issuance by the State Corporation Commission of certificates of public convenience and necessity to common carriers by motor vehicle appear as Chapter 12, sec. 56-273, et seq., Code of 1950, and 1950 Cumulative Supplement thereto (Acts 1950, ch. 219, p. 368).

Section 56-111, Code of 1950 (Acts 1938, ch. 443, p. 1000, as amended by Acts 1944, ch. 367, p. 523, at 537) brings within

the purview of Chapter 12 railroad companies that desire to and apply for certificates of public convenience and necessity to operate as common carrier by motor vehicle. The pertinent part of that section reads as follows:

"Any railroad, electric railway or steamboat corporation operating a railroad, electric railway or steamboat line in this State may acquire, own and operate motor vehicles for the purpose of transporting persons or property over the public highways as a common carrier by motor vehicle as the term is defined by sec. 56-273, subject to the laws of Virginia governing the operations and regulation of common carriers by motor vehicle and all lawful regulations of the Commission made pursuant thereto and applying to other motor vehicles or other common carriers by motor vehicle including the laws requiring the payment of registration and license fees and other taxes by common carriers by motor vehicle, when lawfully authorized so to do by the Commission in accordance with the provisions of such laws and regulations. * * *"

In section 56-273(d) and (e), 1950 Cumulative Supplement (Acts 1950, ch. 219, p. 368), the terms "common carrier by motor vehicle" and "restricted common carrier by motor vehicle" are thus defined:

"(d) The term *common carrier by motor vehicle* means any person who undertakes, whether directly or by a lease or any other arrangement, to transport passengers or property for the general public by motor vehicle for compensation over the highways of the State, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail or water and of express or forwarding companies under this chapter.

"(e) The term *restricted common carrier by motor vehicle* means any person who undertakes, whether directly or by a lease or other arrangement, to transport passengers or property of any restricted class or classes by motor vehicle for compensation, whether over regular or irregular routes."

In *Petersburg, etc., Ry. Co.* v. *Commonwealth,* 152 Va. 193, 203, 146 S. E. 292, 67 A. L. R. 931, Justice Holt defined the phrase "public convenience and necessity" as used in the Motor Vehicle Carrier Act of 1923 (Acts 1923, Ex. Sess., ch. 161, p. 195). In doing so, he quoted with approval from *In re Towns,* 10 Va. Law Reg. (N. S.) 498, wherein the State Corporation Commission had,

in turn, quoted from *In re Aldrich,* P. U. R. 1923A, p. 385. There it was said:

■ " 'So here, the word "convenience," as connected with the word "necessity," is so connected, not as an additional requirement, but to modify and qualify what might otherwise be taken as the strict significance of the word "necessity." * * * 'In the phrase "public convenience and necessity" the word "necessity" means that which is needful, essential, requisite or conducive to "public convenience." When more convenient and adequate service is offered to the public, it would seem that necessity requires such public convenience should be served. * * *' "

■ Defining the term in 1943, the Supreme Court of Utah in *Union Pacific R. Co.* v. *Public Service Comm.,* 103 Utah 459, 135 P. (2d) 915, 917, quoted from *Mulcahy* v. *Public Service Comm.,* 101 Utah 245, 117 P. (2d) 298, 300, where it is said:

"Necessity means reasonably necessary and not absolutely imperative. * * * The convenience of the public must not be circumscribed by holding the term 'necessity' to mean an essential requisite. * * * It is necessary if it appears reasonably requisite, is suited to and tends to promote the accommodation of the public. * * *"

Under section 56-278, Code of 1950, common carriers by motor vehicle (not otherwise exempted), and this necessarily includes a railroad that proposes to thus transport property by trucks, are required to obtain from the Commission a certificate of public convenience and necessity before undertaking to operate over the public highways in this state. Having granted such a certificate to one common carrier, section 56-281, Code of 1950, forbids the issuance of a certificate to another carrier to operate over the route traversed by the former certificated carrier "unless and until it shall be proved to the satisfaction of the Commission that the service rendered by such certificate holder over such route is inadequate to the requirements of the public necessity and convenience;"

Under further provision of section 56-281, in case the Commission deems the service rendered by the operating carrier in any respect inadequate to the requirements of public necessity and convenience, that certificate holder must be afforded reasonable time and opportunity to remedy such inadequacy before

there may be an award of a certificate to another applicant who proposes to operate over such route.

Under the provisions of sections 56-275 and 56-276, Code of 1950, all certificated motor carriers are subject to the supervision, control and regulation of the Commission, and under these sections the Commission may from time to time make and enforce reasonable rules and regulations in all matters pertaining to the performance of their public duties by such carriers.

■ We conclude that the State Corporation Commission is empowered by sections 56-111, 56-278 and 56-281 to award Seaboard the certificate sought authorizing it to operate motor vehicles and furnish the service contemplated, provided it be shown that public convenience and necessity require such proposed service over the route, and that the present motor carriers cannot or will not furnish the service offered.

■ Whether or not public convenience and necessity require rendition of the service offered is an issue addressed to the sound discretion of the Commission. *Jessup* v. *Commonwealth,* 174 Va. 133, 5 S. E. (2d) 482; *Virginia Stage Lines* v. *Commonwealth,* 186 Va. 1066, 45 S. E. (2d) 318.

The final order entered by the Commission on September 21, 1951, however, states ''that the public convenience and necessity does not require the service'' that Seaboard proposes to offer ''as this territory is adequately served by a certificated motor vehicle carrier of freight.'' It thus appears that the Commission's refusal to award the certificate applied for was due to its finding of fact against Seaboard on the issue of whether or not public convenience and necessity required the rendition of the proposed service. Precisely what the Commission's finding of fact was and why that body's factual conclusion was adverse to Seaboard is evident from the following paragraphs from Commissioner Hooker's opinion:

''* * * In considering applications under the Act, the Commission may (Code sec. 56-282), among other things, consider (a) the present transportation facilities over the proposed route, (b) the volume of traffic over such route, (c) the financial condition of the applicant, and (d) the condition of the highways over the proposed route. In this case, there is no question but that Seaboard is financially able to operate the proposed serv-

ice should it be granted the certificate, and the highways over the route are in good condition.

"In the hearing before the Commission, the Applicant presented no testimony to show what the public needs are as to the service it proposes to provide in its application or that public convenience and necessity required that service. Instead, it relied upon the testimony of its Division Superintendent and its Assistant General Manager to the effect that (1) the Railroad will effect economies if the truck operation is authorized; and (2) some shipments now moving by rail could be handled more expeditiously and efficiently by truck, resulting in some cases in earlier delivery to the consignee. Applicant contends that these two reasons, plus the fact that Applicant proposes to serve only its rail stations, differentiate this case from the ordinary motor carrier case and require the Commission to issue to it the certificate of public convenience and necessity over the proposed route. * * *

\* \* \* \* \* \*

"It is quite conceivable to the Commission that the service which Seaboard proposes to render could be highly competitive with the service offered the public by the certificated motor carriers operating over the routes proposed to be served, especially Estes Express Lines. Should it become generally known that Seaboard is authorized to operate and is operating an unlimited and unrestricted intrastate motor carrier service, although auxiliary or supplemental to its rail service, between Norfolk-Portsmouth and the Virginia-North Carolina State Line, what is to prevent the public from sending the traffic now handled by the certificated motor carriers between Norfolk-Portsmouth and Franklin and intermediate points over the Seaboard line. If the Seaboard service should prove attractive to the public, it is to be expected that the public would use it. As the Commission sees it, if the proposed certificate is granted, not only is there a possibility but a strong probability that the very practice, namely, duplication of facilities and destructive competition, which Section 56-281 sought to avoid, would arise. Clearly under that section, the existing certificated carrier has the first right to render the service if there is any need for additional service. * * *"

"No attempt whatsoever was made by the Seaboard to prove that the service rendered by Estes between Norfolk and Frank-

lin and by Nelms and Wilson Trucking Company between Norfolk and Suffolk was in any respect inadequate to the requirements of the public necessity and convenience. Instead, the Applicant says that its proposed service cannot be performed satisfactorily by the existing carriers. \* \* \*''

\*      \*      \*      \*      \*      \*

''\* \* \* No one from the public testified that the present service rendered by the Seaboard was inadequate or made complaint to the Commission that the Seaboard's less-car-load freight movements were too slow. Furthermore, no one testified that the service rendered by Estes Express Lines between Norfolk and the junction between U. S. Route 58 and State Route 35 and intermediate points, or the service rendered by Nelms or Wilson Trucking Company between Norfolk and Portsmouth [and Suffolk] was inadequate to the requirements of public convenience and necessity. In the absence of such evidence, it must be assumed by the Commission that the service rendered by these certificated carriers is adequate.

''The Commission was left entirely to conjecture on the question of (1) public convenience and necessity for the proposed service, and (2) the inadequacy of the service rendered by the present certificated carriers. In this case it is asked to grant the certificate merely because it would be of benefit to the Railroad. As the Commission sees it, public convenience and necessity is a fact like any other fact to be proven by evidence. It was not proven in this case and the Commission has no other alternative but to deny the application. \* \* \*''

■ It is the duty of the Commission to ascertain and determine the facts and in doing so, it is within the province of that body to draw just and reasonable inferences from the proved facts. When that has been done, its factual finding is entitled to and must be accorded weight and its final decision ''must be regarded as *prima facie* just, reasonable and correct. \* \* \*'' *Jones Transfer, etc., Co. v. Commonwealth,* 174 Va. 184, 5 S. E. (2d) 628. It should not be reversed merely because a different inference might have been drawn by us from the proved facts.

Among authorities relied upon by Seaboard are decisions of the Interstate Commerce Commission wherein certificates of public convenience and necessity for motor carriage of property in interstate commerce as auxiliary and supplemental to rail operations were awarded by that body. Cited is *Missouri Pa-*

*cific R. Co. (Guy A. Thompson, Trustee) Extension of Operations,* 41 M.. C. C. 241, 243, wherein it is said:

"Applicant's rail service * * * is uneconomical and inefficient, and it seeks not to enter a wholly new field of service but to substitute a more economical and efficient means of service. One competitive carrier has no vested right in the continuation, by another, of an inefficient method of operation, and we believe it to be neither the policy of Congress nor the proper function of the Commission to retard any form of progress in transportation which will serve the public interest. Public convenience and necessity require the increased economy, frequency, and flexibility resulting from the coordinated service in such a case."

In *Kansas City Southern Transport Co., Inc., Common Carrier Application,* 10 M. C. C. 221, 235, the Interstate Commerce Commission reviewed other decisions having to do with service of this character and granted the railroad the right to establish, through a subsidiary, motor vehicle service as auxiliary to its rail operation. It said:

"The railway is now furnishing a less-than-carload, or merchandise, freight service which is expensive and in many respects unsatisfactory and inefficient. Through applicant, if the certificate sought be obtained, it proposes to use motor vehicles in coordination with its rail operations in such a way that a merchandise service can be provided that will be much less expensive and at the same time more expeditious and more convenient and generally satisfactory to the public served. That these results can be achieved the record leaves no doubt. Moreover, it is clear that this coordinated rail-motor service will be a new form of service, utilizing both forms of transportation to advantage, and differing from the service given by the railway alone or by competing motor carriers alone. That Congress contemplated such coordination is shown by section 202(a) of the act, which declares it to be the policy of Congress, among other things, to 'improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers.' It is also shown by section 213(a) (1), which permits a railroad to acquire a motor carrier, provided we find that the acquisition will promote the public interest by enabling the railroad to 'use service by motor vehicle to public advantage in its operations,' without undue restraint of competition.

"It follows that the new form of service 'will serve a useful public purpose, responsive to a public demand or need.'"

However, in both of these decisions the facts and circumstances in evidence were somewhat different from those appearing in the record before us. In each case the appearance and testimony of a number of shippers along the proposed route affirmatively disclosed that there was public demand and need for the proposed service.

We are also reminded that aside from factual difference, these decisions are not entirely in point because under Part II of the Interstate Commerce Act (49 U. S. C. A., sec. 301, *et seq.*), that Commission is not so restricted in its power to award additional certificates over the same route as is our Commission. No such provision as is contained in section 56-281, is found in the Interstate Commerce Act.

The legal significance of the provision against duplication of service and the public policy embodied in that legislation has been recently stated and thus defined by Justice Spratley in *Virginia Stage Lines* v. *Commonwealth, supra*, at 1074:

"* * * That policy established both by statute and by decision of this court is to grant to a common carrier by motor vehicle the exclusive right to transport passengers [property] over a specified route from specified termini, and then strictly regulate the exercise of that right in the public interest, protecting the carrier meanwhile, so far as compatible with the public interest, against ruinous competition from other carriers."

█ If the public convenience and necessity are being reasonably and adequately served by a certificated carrier, additional certificates on the same route that injure or jeopardize the initial certificate holder should not be granted. *Petersburg, etc., Ry. Co.* v. *Commonwealth, supra; Virginia Stage Lines* v. *Commonwealth*, 185 Va. 390, 38 S. E. (2d) 576; *Virginia Stage Lines* v. *Commonwealth*, 186 Va. 1066, 45 S. E. (2d) 318.

█ It has been shown that the inauguration of this auxiliary service would effect certain monetary savings to Seaboard and would expedite to some extent the service heretofore rendered and release some railroad cars for other use. And no doubt the auxiliary service would be of some convenience to shippers along the route by expediting deliveries of both carload and less-than-carload shipments. Yet the Commission has con-

cluded that the service now rendered by the railroad over the entire route, and by the certificated carriers over two-thirds of the route and to the more populous areas thereon is adequate. It has also factually found that award of this certificate would most likely injuriously affect the business of the present certificated carriers. When all of these circumstances are appraised and weighed, we cannot say that the factual conclusion of the Commission was unjustified or its decision erroneous.

For the reasons stated, the order appealed from is

*Affirmed.*

Eggleston, J., dissenting.

I am of opinion that the order of the Commission is erroneous and should be reversed.

As the majority opinion points out, the Railroad applied to the Commission for a certificate of public convenience and necessity authorizing it to substitute for its carriage by rail of less than carload lots of freight between the stations along its road in Virginia, from Norfolk and Portsmouth to the North Carolina line, an identical service by motor vehicle carrier.

The proposed service would be co-ordinated with the Railroad's existing rail service and auxiliary to or supplemental of that service. The operation would serve only stations on the Railroad's existing rail line, transporting less than carload freight tendered to it for shipment at rail rates and on rail bills of lading to and from its freight stations along this line. Except for the utilization of a highway truck rather than a railroad freight car for the movement of the freight between such stations, a particular shipment would be handled in the same manner as it is now handled.

The majority opinion holds that the Commission has the authority under the statute to grant the permit, but sustains the Commission's finding that the evidence adduced by the Railroad falls short of proving the public convenience of and necessity for the proposed service. I disagree with the latter conclusion.

In *Petersburg, etc., Ry. Co.* v. *Commonwealth,* 152 Va. 193, 203, 146 S. E. 292, 67 A. L. R. 931, we quoted with approval this definition of the crucial words: ''In the phrase 'public convenience and necessity' the word 'necessity' means that which is needful, essential, requisite or conducive to 'public

convenience.' When more convenient and adequate service is offered to the public, it would seem that necessity requires such public convenience should be served.''

While the evidence comes from the officials of the Railroad Company it is uncontradicted and, in my opinion, sustains the position of the Railroad. It shows beyond question that by the proposed service less than carload shipments between these stations in Virginia would be transported more expeditiously and promptly, in some cases saving as much as twenty-four hours in the time of delivery, and at less cost to the Railroad. Local trains would be relieved of their less than carload local business and by the elimination of stops would materially advance their schedules and expedite deliveries of carload business which they would continue to handle. Freight cars now required for the handling of less carload freight and badly needed throughout the nation to relieve the acute railroad car shortage, would be released for the handling of carload business. These uncontroverted benefits to the shipping public constitute important elements of public convenience and necessity.

It is uncontradicted that the difficulty of schedule coordination and other details of operation preclude the satisfactory handling of this business by the existing motor carriers which serve a part of this territory.

Moreover, it clearly appears that the proposed service is not competitive with the services of existing motor carriers. It differs essentially from the service of an ordinary motor carrier operation in that it is merely an adjunct to the Railroad's existing rail service. The Railroad would serve only its rail stations and transport only such shipments as are offered to it as a rail carrier at railroad rates. It would not provide store-to-door pickup and delivery service such as is supplied by motor vehicle carriers.

The record shows that the Interstate Commerce Commission, in the interest of public convenience and necessity, has granted the Railroad a permit to substitute such motor carrier service for less than carload lots of freight moving along this line in interstate commerce. Like authority has been granted for handling similar intrastate shipments along the extension of this line within the State of North Carolina.

Upon the record before us I am of opinion that the Railroad should be permitted to put into operation the proposed service in Virginia.