ABBOTT BUS LINES, INC., ET AL.

V.

COURTESY BUS LINES, INC., ET AL.

Record No. 850202

October 11, 1985

Present: All the Justices

*Donald M. Schubert (Calvin F. Major; Goddin, Major, Schubert & Hyman, on briefs), for appellants.*
*Ross C. Hart; M. Brooks Savage, Jr. (Lewis S. Minter; Hart and Hart Attorneys, Ltd., on briefs), for appellees.*

POFF, J., delivered the opinion of the Court.

This is an appeal by two of several original protestants from an order of the State Corporation Commission awarding an applicant a certificate of public convenience and necessity as a special or charter party carrier by motor vehicle. *See* Code §§ 56-338.50, *et seq.*

The class "B" certificate (*see* Code § 56-338.53) authorized Courtesy Bus Lines, Inc., to provide intrastate service throughout the Commonwealth for trips originating in two cities, Roanoke and Covington, and three counties, Roanoke, Alleghany, and Franklin. Abbott Bus Lines, Inc., and Gibson Bus Line, Inc., the appellant-protestants, pray that the Commission's order "be reversed in full, or at least . . . in part, and remanded insofar as the same authorizes . . . special or charter party service from the City of Roanoke and the County of Roanoke to other points in Virginia."

The Commission based its award upon the threefold test defined in *Atlantic Greyhound* v. *Jones Bus Co.*, 216 Va. 255, 217 S.E.2d 857 (1975). There, we held that by enacting Code § 56-388.54,*

---

* § 56-338.54. When certificates granted.—The public convenience and necessity to be served by special or charter party carriers is to provide economical, comfortable and convenient transportation for special or charter parties and in the issuance of all types of certificates authorized by this chapter the Commission shall consider all facts bearing on that purpose, including existing means of transportation, the character of the applicant,

the General Assembly intended the Commission's decision on an application for a special or charter party certificate to "be based upon a consideration of three factors, namely: (1) an existing public need for the proposed carrier's service; (2) the proposed carrier's ability to provide economical, comfortable and convenient service for the geographical area; and (3) the economic and competitive impact which the proposed carrier would have upon existing carriers providing similar service within the same territory." *Id.* at 258, 217 S.E.2d at 859.

The protestants first contend that the evidence was insufficient to support the Commission's finding of public need. The evidence showed that George H. Ashwell, formerly employed as a bus driver by Abbott, decided to go into business for himself. Courtesy, of which Ashwell is president, sole stockholder, and principal driver, was incorporated in April 1984. The Interstate Commerce Commission granted the Roanoke-based company charter party authority for trips within the continental United States, and in May 1984, Courtesy filed an application with the State Corporation Commission for a class "B" certificate authorizing certain intrastate trips. Courtesy owns and operates two 1984 model motor coaches, each of which accommodates 47 passengers.

At the time of the October 1984 hearing conducted below, six carriers, three of which were based in Roanoke, offered intrastate charter service originating in the Roanoke metropolitan area. Witnesses representing a travel agency and senior citizens groups testified that the two largest carriers were "much more expensive", "quite a bit more expensive", and senior citizens "cannot afford them". One carrier offered only commuter service and "short trips". Another operated "mini-buses" and owned only one larger coach. Gibson and Appalachian Coach Company, Inc. (an allied corporation based in Roanoke) jointly owned 13 full-sized buses

---

and the kind and location of the equipment he proposes to use. The Commission shall issue no more certificates than the public convenience and necessity require, and shall place such restrictions upon such certificates as may be reasonably necessary to protect any existing motor carrier, whether such carrier is operating under certificates issued by the Commission under this chapter or under chapters 12 (§ 56-273 et seq.) or 12.3 (§ 56-338.40 et seq.) of this title or otherwise, but the Commission shall not deny a certificate solely on the ground that the applicant may render special or charter party service originating at the same point or points as such other motor carriers. The Commission shall protect the private intercity charter industry to the extent reasonably practicable from carriers receiving grants from federal and State agencies where private operators are willing and able to provide such service.

and Abbott 23. In the two years preceding the hearing, Gibson had spent $600,000 "to try to meet the public need, as far as updating the equipment." In the last six months, Abbott had added four units to its fleet of buses.

Courtesy introduced eight witnesses in support of its application. Ashwell testified that he had received "[a]t least . . . a call a week" requesting intrastate charter service. When he explained that Courtesy could not make intrastate trips and advised his callers to contact other bus lines, they usually told him "there is nobody else to call, they can't get the buses." Two of the three Roanoke-based charter carriers had contacted Ashwell seeking additional buses because their own coaches were fully committed.

Kathleen Simms, Courtesy's treasurer and office manager, testified that she had received requests for intrastate transportation from callers who told her "we can't get a bus unless we go . . . out of state . . . to get one." She said that, in the week preceding the hearing, she had received "at least 15 calls wanting a bus" for intrastate trips planned for a weekend in November.

The Commission heard the testimony of six public witnesses in support of Courtesy's application. Essie Doss, who has been organizing from 12 to 20 intrastate and interstate trips per year for senior-citizen groups in Rocky Mount and Franklin County, testified that she had been using Abbott transportation "when I could get them" but that "[t]he last year or two, when I called to book them, they didn't have charter service for me on occasional trips". She said that Abbott "didn't have any buses available to me" for trips she had arranged to "Tangier Island, Williamsburg and what have you" in the spring of 1984. "[B]ecause I have a problem with transportation," she added, "I didn't run very many [intrastate trips] last year". Doss felt that there was a need for additional charter service in the area because senior citizens "would like to take trips, one-day trips, and they are looking for the cheapest way [and] the quality of the bus service". Beulah Davis, a tour-guide assistant to Doss, agreed that there is a need for Courtesy's service.

Donna Fox, who arranges trips for senior citizens in Covington and Alleghany County, usually employs Courtesy and Abbott. "This past spring," she said, "we had to call the second bus line because Abbott was not available in the spring." She explained that "[w]e were going to go to a second carrier, but the trip didn't go through." Some trips she planned had to be rescheduled be-

cause buses were not available. Fox preferred to use Courtesy because its prices were "[l]ower", its equipment was "[g]reat", its service was "[t]errific", and Ashwell was one of the senior citizens' "favorite" drivers. The testimony of Shirley Pullen, Fox's superior, was to the same general effect.

Elizabeth Hagood, a travel broker whose licensed area extends to Roanoke and Roanoke County, had recently opened her own travel agency in Bristol following eight years' experience with an agency in Richmond. She planned to organize "motor coach trips through Virginia and outside of the state." Hagood believed there "is a demand for the Williamsburg area, the Yorktown area, the Northern Virginia area and . . . the southwest Virginia area". She said she supported Courtesy's application because she "could not work with Mr. Abbott" and felt that Abbott's service "was not handled in a business-like way."

Mary Garman arranges charter party trips for the Roanoke Fiddle and Banjo Booster Club. The club, which has several thousand members drawn from the Roanoke community and elsewhere, holds meetings and conducts concerts once a month at the Civic Center in Roanoke. Garman said that the group charters buses, sometimes as many as three, for "[a]pproximately 45 trips" a year to points in Virginia and other states. "We do approximately [$45,000.00] to $50,000.00 worth of business a year with the bus company," she said, and "[m]ost of my bus trips leave from Towers Mall", a shopping center in Roanoke. She testified that, in past years when the club was using Abbott buses, the club had "taken a lot of trips . . . to Williamsburg and different places" in Virginia. In the last two years, however, the group had not chartered Abbott and had taken only three intrastate trips arranged with other certificated carriers.

Sam McConville, representing Gibson and Appalachian, acknowledged that, until he received last-minute cancellations of two coaches, his entire fleet of 13 buses had been fully committed for the Saturday following the hearing. Fred Abbott, president of protestant Abbott, acknowledged that all of its coaches were booked for two weekends later in the fall.

On brief, the protestants challenge the probative value of Ashwell's testimony and that of his office manager concerning public need for additional intrastate transportation. They characterize it as self-serving, predictable, undocumented, and uncorroborated. But the Commission assesses the credibility of the witnesses and

the probative weight to be given their testimony, and we accept its assessment.

The testimony of the witnesses from Covington and Franklin County, the protestants insist, was irrelevant because it "is not evidence of a need in Roanoke." In order to prevail, they argue, Courtesy had the burden of producing "the Foxes and Dosses of Roanoke City and County to demonstrate the public need, via inadequacy of existing service".

We find two flaws in this argument. First, we do not agree that the testimony that intrastate service was unavailable to customers in Covington and Franklin County was irrelevant to the question of public convenience and necessity in Roanoke. When a carrier's buses are fully committed, they are unavailable to the public everywhere. Second, Courtesy produced a witness thoroughly experienced in the needs and preferences of charter travellers in the Roanoke community. Garman represented a Roanoke-based club which had spent more than $45,000 a year for charter trips, including "a lot" of intrastate trips, most of which originated at a shopping center in Roanoke. In the last two years, the club had taken only three intrastate trips. Although Garman did not expressly attribute this to unavailability of existing intrastate service, her testimony justifies the inference that the service available was unacceptable to the club. Moreover, in light of the club's former history of intrastate travel originating in Roanoke and Garman's support of Courtesy's application, the Commission could fairly conclude that the club needs and plans to utilize the new services authorized by the Commission.

■ As used in the statutes regulating motor vehicle carriers, the words in the phrase "public convenience and necessity" are not semantically independent and distinct but conceptually interrelated. The word "convenience" modifies and qualifies the literal import of the word "necessity." Considered contextually, the two words do not require a showing of imperative need rooted in public hardship. In applying the statutory phrase, the Commission is entitled to consider public convenience as well as an imbalance in supply and demand. See the judicial constructions of the phrase quoted with approval in *Seaboard Air Line Co.* v. *Commonwealth*, 193 Va. 799, 806, 71 S.E.2d 146, 150 (1952).

■ Whether the service offered by Courtesy was justified by public convenience and necessity was "an issue addressed to the sound discretion of the Commission." *Id.* at 807, 71 S.E.2d at

151. Viewing the evidence and the reasonable inferences it raises in the light most favorable to the prevailing party, we hold that the record supports the Commission's finding.

In a second assignment of error, the protestants contend that the Commission "erred in finding the evidence sufficient to establish the applicant as fit and capable of rendering the proposed service."

■ In making a "fitness" determination, the Commission is required to consider, among other things, "the character of the applicant, and the kind and location of the equipment he proposes to use." Code § 56-338.54. While the protestants complain that Ashwell "has little, if any, business experience", they do not challenge his character or the quality of Courtesy's equipment. Instead, they question the applicant's financial capacity.

Simms testified that, until Courtesy bought its second bus, it had operated at a profit. Although at the time of the hearing Courtesy had a deficit posture, it had set aside $16,000 in operating capital to supplement operating revenues. Furthermore, for the protection of the public, Courtesy had acquired $2.5 million in general liability insurance on each of its two buses—coverage in excess of that required by the Commission.

As the Commission noted in its opinion, "it is not unusual for a newly formed corporation to lose money in its first year of existence." Abbott's president testified that carriers "make more money on intrastate trips [than on interstate trips] because our costs are so much lower." Significantly, Courtesy had incurred its deficit while restricted to interstate operations. The Commission's fitness finding was a finding of fact, and we cannot say that it was not supported by the evidence.

■ Finally, the protestants maintain that "[t]he Commission erred in failing to deny the application . . . based on the economic and competitive impact upon . . . existing carriers providing similar service within the same territory." They argue that existing service is adequate to meet demand and that their equipment is already "underutilized". The current level of competition, they say, forces them to retain and invest a large share of corporate earnings in new equipment, and they fear that the entry into the market of another competitor would have "a devastating effect" upon their operations. They charge that the Commission ignored the statutory clause authorizing the Commission "to protect any existing motor carrier."

We are aware that certificated carriers must make substantial capital investments, and we agree that they are entitled to rely upon the protection afforded by the statute. We do not agree, however, that the statutory protection is so broad as to guarantee existing carriers an exclusive license to operate indefinitely in a particular community. Although Code § 56-388.54 empowers the Commission to "place such restrictions upon [new] certificates as may be reasonably necessary to protect any existing motor carrier", the statute expressly forbids the Commission to "deny a certificate solely on the ground that the applicant may render special or charter party service originating at the same point or points as [existing] motor carriers."

As we construe this language, the General Assembly, recognizing the public benefits of competition in the market place, authorized the Commission to deny a charter party certificate only when it finds that a grant will create competitive pressures so intense that existing carriers will be unable to earn a reasonable profit. By protecting certificated carriers from such ruinous competition, the statute protects the public from loss of service.

The Commission found that "Courtesy's entrance into the market will not result in ruinous or unreasonable competition" and that "[d]enial of Courtesy's application would sacrifice the public interest to the self-interest of existing carriers." The evidence supports these conclusions. The protestants acknowledge that they have been turning away prospective customers, and the new certificate will add only two motor coaches to a market currently served by 36 buses.

Finding no error below, we will affirm the order.

*Affirmed.*