# CHARLESTON.

BLUEFIELD TELEPHONE COMPANY *v.* THE PUBLIC SERVICE
COMMISSION OF WEST VIRGINIA

(No. 5709)

Submitted September 1, 1926.    Decided October 5, 1926.

1. PUBLIC SERVICE COMMISSION—*Order Will Not be Annulled
Unless it Manifests Unlawful, Arbitrary or Capricious
Power, or be Subject to Judicial Review Further Than
Necessary to Keep Commission Within the Law and Pro-
tect Constitutional Rights of Corporation.*

   An order of the Public Service Commission will not be an-
   nulled by this court unless the order manifests unlawful,
   arbitrary or capricious exercise of power. Judicial review
   should extend no further than is necessary to keep the Com-
   mission within the law, and protect the Constitutional rights
   of the corporations which it controls.    (p. 300.)

2. SAME—*Where Rate Case is Determined from History of
Utility Instead of Opinion of Expert Witnesses Order of
Commission Will Not be Disturbed.*

   The Public Service Commission determined a rate case
   from the history of the utility, instead of from the opinions
   of an expert witness who testified for the utility. *Held*, the
   order will not be disturbed.    (p. 304.)

The Bluefield Telephone Company, Petitioner against The
Public Service Commission, Respondent. The Telephone Com-
pany petitions this court to set aside an order of the Public
Service Commission.

*Writ dismissed.*

*D. J. F. Strother,* for petitioner.
*F. M. Livezey,* for respondent.

HATCHER, JUDGE:

The Bluefield Telephone Company is a public service cor-
poration owning property and doing business in Virginia and
West Virginia. It filed before the Public Service Commission
of this state, on October 2, 1925, certain tariffs which were

estimated would increase its annual revenue about $33,000.00.

On April 24, 1926, the Commission cancelled the proposed tariffs. The Company complains in this court of the Commission, because of (1) the valuation fixed as the rate base, (2) the rate of depreciation allowed, and (3) the conclusion that the present revenue is an ample return of the Company's investment.

(1)

The fair value of the Company's property on October 31, 1925, as fixed by the Commission is:

| | |
|---|---|
| Physical Property | $900,000.00 |
| Working Capital | 40,000.00 |
| Going Concern Value | 50,000.00 |
| Total Valuation | $990,000.00 |

The fair value of its property claimed by the Company as of that date is:

| | |
|---|---|
| Physical Property | $ 943,916.51 |
| Working Capital | 77,241.00 |
| Going Concern Value | 167,188.96 |
| Total Valuation | $1,188,237.47 |

(a)   The principal witness for the utility was H. C. Gretz, who is chief accountant of the Chesapeake and Potomac Telephone Company. The book value of the physical property of the utility within this state, was $934,895.16 as of December 30, 1924. Mr. Gretz deducted 15% from this amount for depreciation, and accepted the remainder of $881,131.17 as the fair value of the physical property on that date. Between December 31, 1924, and October 31, 1925, additions were made to the physical property amounting to $62,785.34. The sum of these additions and the value as of December 31, 1924, makes the sum claimed by the Company. The greater part of the difference between the estimate of the Company and that of the Commission is attributable to an item of $36,570.91, which the Commission disallowed. The book value of the Company's property in 1913 was $239,290.27. An appraisal

made that year estimated the value of the property at $26,318.34 more than the book value. This excess was added to the book value and according to the conclusion of E. V. Williamson, the statistician for the Commission, "The plant and equipment account on and after December 1, 1913, includes an inflation of $26,318.34, caused by said appraisal." The Commission apportioned $19,738.74 of this "inflation" to the West Virginia property, and then raised the apportionment to 1924 values. The result is the $36,570.91 item.

The Company does not controvert the apportionment of this item or its reflection in 1924 values as made by the Commission; but contends that the book value of its property in 1913 was too low, and that the appraisal value was correct.

The position of the Commission in regard to the appraisal is: "The method of making the inventory and appraisal is not disclosed, and it must therefore be insisted that the actual investment, reflected in the true book costs, should be the basis for the calculation."

The report of the Commission also states that no evidence was offered showing the date when the additions to the property should become available for public use, or that all of the Company's property (upon which the estimate was based), was being used or was capable of use in public service. The Commission imposed on the Company the burden of proof to establish with accuracy and clearness, not merely the value of its property, but the value of *what is devoted to public use.* Because of its failure to carry this burden, the Commission did not feel warranted in placing a greater value on the physical property than $900,000.00.

It is a fair assumption that a corporation will ordinarily record the correct value of its property on its own books. The books should therefore be considered as offering more dependable evidence of value, than the higher estimates of appraisers or witnesses, unless some plausible reason is advanced why the book value is too low. *Davis* v. *Gas Co.* P. U. R. 1921 B, 342.

In this case the appraisers were not called as witnesses. The personnel of the appraisers is not disclosed. The manner in which the appraisal was conducted does not appear. No wit-

ness testified that the appraisal value was correct, or explains why the book value was inaccurate. We therefore cannot disapprove the action of the Commission in adopting the utility's 1913 book value.

(b)  In the claim of the Company to an allowance of $77,241.28 for Working Capital is included $51,157.09 for material and supplies. Mr. Gretz would justify this item by the argument that the Company is doing a large amount of construction work, and that in order for it to obtain good prices on its purchases, it must buy in large quantities.

The reasons given for the Commission for not according this amount are as follows: "The record in this case discloses that the Company, during the past few years, has carried on hand an unusually large stock of supplies and materials averaging in value something less than $40,000.00 assignable in this State. So large a stock should not be carried in the future, for the reason that it must be assumed that a large part of the material and supplies included in the above amount was used in making extensions and should not be included in Working Capital. Its average annual prepayments amounted to less than $5,000.00. The evidence shows that its bills for flat rate service are billed monthly in advance, a large part of which is subject to a discount of 25c if paid before the 10th of the month for which the bill is rendered. Gross operating costs were less than $17,500.00 per month last year." Owing to the fact that the patrons of telephone companies pay by the month, practically all the decisions relating to working capital are based on monthly operating expenses. Working capital, "once established is a revolving fund, constantly being expended and replenished." *Re N. Y. Tel Co.* P. U. R. 1923 B, 545 (611). Some of the cases limit the allowance for working capital to a sum approximating one-twelfth of the annual operating expenses. Others, more generous, place the working capital at one-twelfth of the annual expenses, plus an allowance for materials and supplies. This last plan was followed by the West Virginia Commission in *Re C. & P. Tel. Co.* P. U. R. 1921 B, 97. It should satisfy the utility if a sufficient allowance for supplies is made.

In the present case the Commission being apprised that the monthly operating expense approximates $17,500.00, has allowed for supplies $22,500.00. We cannot say from the evidence that this sum in inadequate.

(c)    The Gretz estimate of going concern value was entirely conjectural. His report says: "Considering the size of the Company and the territory which it serves, it is believed that the Company is entitled to at least 15% of the value of its physical property and working assets as a going concern value." He testified that a small company called for a larger allowance than a large company, and that his opinion was based on his knowledge of the whole property as well as similar allowances made by courts and commissions.

The Commission took the view that the value of a going concern as such, could not be fixed by a rule applicable to all cases, and that much of what should properly be considered as going concern value was included in the value given the physical property. The total capital stock issued by the Company amounts to $676,000.00. Its funded debt is only $50,000.00. The business of the Company has been profitable. Yet, the report states, the stock does not sell readily at par.

It is true that some commissions have fixed going concern value on a percentage basis. The weight of authority, however, has refused to sanction the percentage theory. The Wisconsin Commission in *Re Racine Water Co.* P. U. R. 1917 D, 277, stated emphatically that the going concern value of the utility "cannot be ascertained by using a definite percentage of the reproduction cost. * * * Too much depends upon the surrounding circumstances of each individual case, which certainly must be considered in arriving at any fair going value." The Nebraska Commission also held that going concern value "Must vary with the particular circumstances." *Re Power Co.* P. U. R. 1921 C, 678 (695). The Alabama Commission elaborated the rule in *Re Ala. Power Co.* P. U. R. 1923 B, 29, in which it held that going concern value of a utility could not be determined upon a percentage basis, but that such value depended "on the features of that particular utility, with respect to organization, established credit, and

development cost." The Indiana Commission is positive that "On account of the different conditions surrounding given utilities, no hard and fast rule can be formulated", as to the determination of going concern value. *Commercial Club* v. *Fuel Co.* P. U. R. 1916 E, 1 (20). The Supreme Court of the United States said in regard to this value: "Each case must be controlled by its own circumstances." *Gas Co.* v. *Des Moines,* 238 U. S. 153 (165). In discussing this subject in *Denver* v. *Water Co.,* 246 U. S. 178 (192), the Court reiterated "As has been observed, each case must be controlled by its own circumstances." The same idea is again found in *City of Houston* v. *Tel. Co.,* 259 U. S. 318, where is was declared that the going concern value of a utility "depends on the former history of the corporation."

In determining the going concern value of the utility in this case, the Commission has but followed the course supported by reason and the highest precedent.

## (2)

The petitioner claims that it should be allowed to depreciate its property at the rate of 5.97%. Why? Again the utility depends on Mr. Gretz, who thinks that per cent is right. He bases his opinion in part on a study of depreciation allowed in other rate cases. The history of this Company shows that prior to December 1, 1913, it had no depreciation reserve; that since then its composite rate of depreciation has been approximately 6% and that the realized or used depreciation during that time has been only 2.21%. The report submitted by Mr. Williamson shows that between December 31, 1913, and December 31, 1924, the Company accrued for depreciation a total of $404,271.48, and that of this amount $145,536.60 has been realized, leaving an unused balance in reserve of $304,157.04. The report of the Commission holds: "It appears to the Commission that an annual charge of 5.97% against the ratepayers for depreciation is inconsistent with the fact that an average annual depreciation of only 2.21% was actually used during the past eleven years. During this period the Company has kept pace with a rapid

growth of telephone business, and losses from inadequacy have necessarily been heavy. The period has also witnessed a remarkable development of the telephone art, with consequent losses from obsolescence. It may be noted that the retirements in the past few years have been unusually large. This fact is due, however, to the necessity of installing underground cables and other changes in the cities of Bluefield and Welch and elsewhere, among other things to enable the Company to conform to municipal paving plans. Station apparatus and installations, and aerial cables and wire of great value, have been retired. It is reasonable to assume that such unusual charges from this source will not occur in subsequent years. * * * Upon consideration of all the circumstances reflected in the record of this case, the Commission is of opinion that a depreciation rate of 5.97% is excessive and unwarranted, and to fix four (4) per cent as an ample rate for the annual depreciation charge, to be included in operating expenses.''

An examination of the decisions shows that the rates of depreciation permitted telephone companies range from 2% to 10% of the value of the physical property. We find no uniformity in the rates allowed, but do find uniformity in the view that depreciation depends largely upon the kind of the property, and the nature of its use, and that the rate should be determined from a careful inspection of the property. *Re Webster Tel. Co.* P. U. R. 1915 E, 516; *Churchill* v. *Light and Power Co.* P. U. R. 1916 F, 752 (767-8). In *Re Springfield St. Rr. Co.* P. U. R. 1918 C, 515 (537), the Massachusetts Commission said: ''Determination of depreciation requirements is not an exact science, but an estimate of probabilities based on past experience.'' The Commission did not refer to the past experience of witnesses, but to the past experience of the utility. The California Commission states without equivocation that the rate of depreciation cannot be determined by rules of thumb or by the use of general percentages, but that the rate applied to each property must be governed by the particular circumstances and requirements of that company. *Re Southern Tel. Co.* P. U. R. 1922 C, 97.

In the present case the history of this utility shows that it has accumulated in its treasury an amount much greater than the exigencies of the company require. A depreciation rate which accumulates and retains a surplus "beyond the reasonable requirements of the company", should not be foisted upon the patrons of a utility. *City of Meriden* v. *Light Co.* P. U. R. 1921 B, 611. In the present case the depreciation reserve amounts to practically 30% of the value of the Company's property. The decisions oppose the accumulation of such a large reserve. *Churchill* v. *Power Co., supra,* 768; *City of Fort Wayne* v. *Tel. Co.* P. U. R. 1920 D, 83. We find one decision which advocates that the depreciation reserve should at all times approximately equal the difference between the cost of the physical property and its present depreciated value. *Washington Dept. of Public Works, etc.* v. *Tel. Co.* P. U. R. 1923 D, 113 (123). Mr. Gretz was of opinion that the property of the utility was in 85% physical condition. If the above rule be applied to this case, the depreciation surplus should be reduced to 15% of the physical value of the property, or in other words, to approximately $150,000.00. It is not the province of the Court to fix the rate of depreciation. *Cin.* v. *Com.,* 105 Ohio St. 181. But in this case we thoroughly approve of the reduction in the rate made by the Commission.

(3)

The revenues and operating expenses of petitioner for the year ending June 30, 1925, were $317,300.48, and $199,074.11, respectively, leaving an undepreciated surplus of $118,226.37. Four per cent (4%) depreciation of the fair value of the utility as fixed by the Commission is $39,117.67. If this sum for depreciation be deducted from the surplus of $118,226.37, a balance of $79,108.44 remains. Mr. Williamson filed a statement of the revenues and operating expenses of the Company for the 10 months ending October 31, 1925. A calculation based on Mr. Williamson's report shows that excess of revenue over expenses for the year 1925 should be $122,547.45. Deduct the $39,117.67 depreciation from this estimate and $83,429.78 will be the net revenue. A net revenue of from $79,000.00 to $83,000.00 is approximately an 8% return on

the fair value of the utility's property; 8% is ordinarily considered a sufficient return for telephone companies, and nothing appears in this record to show that it is not ample in this case.

The case of petitioners is based almost entirely upon the evidence and report of Mr. Gretz. Mr. Gretz makes no claim of personal familiarity with the physical property of the Company. His recommendations simply represent his personal opinions and theories. But, say counsel for the utility, his evidence is the only evidence in this case on several of the propositions, and therefore it must prevail. Counsel have overlooked the history of the Company as presented to the Commission. Past performance is far more potent evidence than conjecture. We find that scant heed is ordinarily accorded the mere opinion of the professional expert in rate cases. *Lighting Co.* v. *Lewis*, P. U. R. 1920 D, 145 (156); *Re Traction Co.*, P. U. R. 1918 F, 840; *Pub. Serv. Co.* v. *Coms.*, 84 N. J. Law, 463 (479); *Gas Co.* v. *Des Moines*, 199 Fed. 204 (205); *City of Knoxville* v. *Water Co.*, 212 U. S. 1 (18). In the case last cited the Supreme Court characterizes the testimony of expert witnesses employed by the parties as "That most unsatisfactory evidence." We find no case in which the opinions of an expert were accorded sufficient weight to overthrow the deliberate judgment of a commission, based, as in this case, on the history of a utility.

The burden of proof was upon the petitioner to establish its case by direct evidence. *Gas Co.* v. *Public Serv. Co.*, 95 W. Va. 557; *City of Cin.* v. *Ohio Com.* (Ohio), 118 N. E. 97. It has failed to sustain that burden. The reasons advanced by the Commission for its several rulings show careful consideration of the claims of the applicant, and are therefore entitled to the utmost respect. The solution of problems such as these is peculiarly within the province of the Commission. In this case the Commission has exercised its judgment in good faith. We find no reason to question the result. *Gas Co.* v. *Com.*, 73 W. Va. 571; *St. Com.* v. *City of Springfield* (Ill.) 125 N. E. 891; *Gas Co.* v. *McCall*, 219 N. Y. 84, Ann. Cases 1916 E, 1042.

*Writ dismissed.*