THE CHESAPEAKE AND OHIO RAILWAY COMPANY

*v.*

PUBLIC SERVICE COMMISSION OF WEST VIRGINIA

(No. 10606)

Submitted September 22, 1953. Decided December 18, 1953.

162

*Fitzpatrick, Marshall, Huddleston & Bolen, Amos A. Bolen, Hewitt Biaett, R. T. Wilson, Jr.,* for petitioner.

*H. Clare Hess,* for respondent Public Service Commission.

*J. Henry Francis, Jr., Frank T. Litton, James A. Bibby, Jr., James C. White, James A. McWhorter, A. G. Stone, Charles T. Doddrill, David G. Macdonald, Francis W. McInerny, Macleay & Lynch,* for intervening respondents.

GIVEN, JUDGE:

This appeal brings to this Court for review a final order of the Public Service Commission of West Virginia, entered February 16, 1953, in Motor Case No. 13012, upon application of The Chesapeake and Ohio Railway Company for authority to transport over the highways of this State, by motor truck instead of by rail, within a defined area, freight in less than carload quantities. The application filed herein states: "That the petitioner desires a certificate of convenience and necessity to operate motor vehicles for the transportation of property in the territory or over the routes and/or between the termini, as hereinafter described. *Commodities or class of commodities:* General commodities without limitation, on rail bills of lading at rail rates by motor service auxiliary to and supplementary of train service in the handling of l. c. l. freight serving only stations on the railway. The purpose of the application is to render a more expeditious, economical and flexible service to the public in the handling

of l. c. l. freight now moving by rail." A large number of motor vehicle common carriers, operating under proper authority within such area, or parts thereof, appeared before the commission and protested the granting of such authority. After hearing the testimony of a large number of witnesses, both for and against the granting of the authority, the commission denied the application. The record upon which the matter was determined by the commission is now before this Court.

Generally, the area involved is the area served by the applicant along its main line extending from Huntington through Charleston to Mt. Carbon, including the area served by the branch lines of the applicant between Huntington and Mt. Carbon. Within that area the applicant now serves approximately one hundred ninety-seven railway stations. Approximately one hundred sixty-three of these stations could be served by the proposed substitute truck service. The area involved is clearly defined in the application and for convenience may be referred to in this opinion as the Kanawha District. Also, the truck routes and the equipment proposed to be used in the proposed substitute service are fully defined and described in the record made before the commission.

Applicant has operated as a railway common carrier of property throughout the Kanawha District for approximately fifty years, and within parts of that district for more than three-fourths of a century. About 1920 it was transporting by rail, within Kanawha District, approximately one hundred fifty million pounds of less than carload freight per year. In 1952 it was transporting less than six million pounds of less than carload freight per year. For all practical purposes, one or more of the protestants, under proper authority, now operate in some one or more of the several parts of Kanawha District. No one carrier actually operates throughout the entire district. Throughout the district there exists a large number of large coal mine operations, and other important businesses, necessitating the shipment into and out of the district of an

amount of less than carload freight which may be described as enormous, as revealed by the testimony of protestants relating to the quantity of freight transported by them to or from the district.

On its main line between Huntington and Mt. Carbon, under its present authority applicant handles its less than carload freight, both interstate and intrastate, by local freight trains. On its branch lines within the Kanawha District the less than carload freight is handled in boxcars placed in coal trains. Applicant contends that such method of handling the less than carload freight transported by it necessarily results in much inefficiency and delay in its overall operations, in that the stopping of its trains for the delivery of single or small shipments necessarily delays the whole train, blocks the use of the tracks as to other trains, engages the time of whole train crews, and requires the use of an unreasonable number of railroad cars. It is clearly shown, and apparently not denied, that the present method of applicant's handling of less than carload freight is inefficient and results in a delay of approximately three days in the delivery of individual shipments. Also, it is clearly proved, and not denied, that the less than carload freight handled by applicant can be better and much more efficiently handled by the proposed substitute truck service, coordinated with its rail service, at a very substantial savings to applicant. It is also clearly proved, and not denied, that the proposed substitute truck service will result in a much better service for that part of the public now using the facilities of applicant, both as to less than carload freight and carload freight, and both as to intrastate and interstate shipments. Applicant, however, offered no evidence tending to show that the service being furnished within the Kanawha District by the protestants is inadequate or insufficient. It also clearly appears that the protestants are capable, financially and otherwise, of rendering efficient service as to the transportation of less than carload freight, including that now transported by applicant, demanded by shippers or re-

ceivers of such freight within the Kanawha District, or what may be demanded in the foreseeable future.

As above noticed, applicant now handles its interstate freight shipments in less than carloads lots, within the Kanawha District, in precisely the same manner as it now handles its intrastate freight shipments, in less than carload lots, within that district. It is established by the record that the interstate shipments constitute approximately 95.3 per cent and the intrastate shipments constitute only about 4.7 per cent of all shipments originating within or delivered to points within the Kanawha District. About the time of the filing of the application in the instant proceeding, the applicant filed with the Interstate Commerce Commission its application for authority to transport its interstate shipments of less than carload freight by the precise substitute service sought in the instant proceeding, which authority was granted. The Chesapeake and Ohio Railway Company, Extension—West Virginia, Docket I.C.C. No. MC—109867 (Sub. 4), decided April 7, 1953. Part of the conclusions reached by the examiner and approved by the Interstate Commerce Commission, deemed of interest here, are quoted: "The examiner is not impressed with the reasons advanced by protestants for the denial of the application. Applicant has not abandoned less-than-carload service and it should not be denied the right to improve such service when, it elects to do so. The application is not one in which authority is sought to provide an all-motor service the same as provided by the existing motor carriers. The proposed operation is designed solely to improve applicant's present less-than-truckload service in the territory. The present service is slow, inefficient and expensive. And it is not satisfactory to applicant and the shipping public. The authority sought will not enable applicant to enter a new field, but will permit it to substitute for the present service a new efficient form of service which will be faster and more economical in the transportation of less-than-carload rail traffic which applicant has been and is obligated to transport. The examiner does not believe

it to be the intent of the Interstate Commerce Act to vest in one class of carriers the right to require the continuation by another of an inefficient and more costly method of operation. Nor is the examiner convinced that existing motor carriers will be materially affected by the proposed improvement in applicant's merchandise service. The preponderant portion, if not all, the interstate traffic which applicant will handle in the proposed operation will be traffic which applicant has been transporting because it will move by railroad beyond Charleston or Huntington and from origin to destination on rail billing and at rail rates. It is not believed that the proposed coordinated service will result in such increased interestate traffic that it would seriously endanger the operations of existing motor carriers. In any event, the public should not be deprived of the benefit of an improved service simply because it might divert some traffic from other carriers. *Kansas City S. Transport Co. Inc. Com. Car. Application,* 28 M.C.C. 5. * * * The examiner finds that the present and future public convenience and necessity require operation by applicant, in interstate or foreign commerce, as a common carrier by motor vehicle of general commodities, between the points and over the routes described in Appendix B hereto * * *".

The finding of the Public Service Commission of West Virginia in the instant proceeding, in so far as material here, follows: "* * * As the Motor Carrier Law specifically requires a railroad seeking authority to operate motor vehicles for hire to obtain a certificate for such operation, the Commission is of the opinion that before granting such certificate it must take into consideration the service offered by the existing motor carriers and that if the evidence offered by the applicant railroad does not show such existing motor carrier service to be inefficient and inadequate, such application should be denied. The evidence offered by the applicant in this case is sufficient to show that the proposed rail-truck service would enable applicant to render better service,

particularly to certain of its present shippers, but it is not sufficient to show that the motor vehicle service of the protestants is inadequate or insufficient, and said application must, therefore, be denied.

"The Commission does not believe that the application as made and the evidence as presented require it to pass on the question of whether or not applicant might be entitled to a certificate if prior or subsequent rail haul of the l. c. l. freight were required and key point restrictions were imposed".

It will be noticed that the application was denied by the Public Service Commission for the reason that the evidence failed to "show that the motor vehicle service of the protestants is inadequate or insufficient". It will further be noticed, however, that the Public Service Commission also found that "The evidence offered by the applicant in this case is sufficient to show that the proposed rail-truck service would enable applicant to render better service, particularly to certain of its present shippers, * * *". As above noticed, the evidence clearly establishes that the proposed substitute truck service will not only provide a much better service to that part of the public now being served by applicant, but will be furnished at a very substantial savings to applicant.

The Public Service Commission deemed the controlling questions to be: "1. Is the proposed motor carrier service to be conducted by the applicant so different in point of fact from the existing truck service that the Commission may find that the proposed service is non-competitive? 2. Does the fact that the applicant herein is a common carrier by rail relieve it of proving inadequacy of existing motor carrier service when it makes application for a certificate of convenience and necessity under the Motor Carrier Law?"

The regulation of the transportation of commodities over the roads of this State by common carriers, whether carriers by rail or motor vehicle, was placed in the Public Service Commission by an Act of the Legislature of 1937,

Chapter 50. The Act was amended by the 1939 Legislature, Chapter 86, and by the 1947 Legislature, Chapter 134, and is designated as Chapter 24-A of the Michie Company Code of West Virginia, 1949. For convenience, the Act, as amended, will be referred to in this opinion as the Motor Carrier Act. Subsection (e) of Section 2 of Article 1 of the Motor Carrier Act reads: "* * * the term 'common carrier by motor vehicle' means any person who undertakes, whether directly or by lease or any other arrangement, to transport passengers or property, or any class or classes of property, for the general public over the highways of this State by motor vehicles for hire, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail, water or air and of express or forwarding agencies, and leased or rented motor vehicles, with or without drivers * * *". Section 5 of Article 2 of the Motor Carrier Act reads, in part: "(a) It shall be unlawful for any common carrier by motor vehicle to operate within this State without first having obtained from the commission a certificate of convenience and necessity. Upon the filing of an application for such certificate and after hearing thereon, if the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof, it shall issue the certificate as prayed for, or issue it for the partial exercise only of the privilege sought, and may attach to the exercise of the right granted by such certificate such terms and conditions as in its judgment the public convenience and necessity may require, and if the commission shall be of the opinion that the service rendered by any common carrier holding a certificate of convenience and necessity over any route or routes in this State is in any respect inadequate or insufficient to meet the public needs, such certificate holder shall be given reasonable time and opportunity to remedy such inadequacy or insufficiency before any certificate shall be granted to an applicant proposing to operate over such route or routes as a common carrier. Before granting a certificate of a common carrier by motor vehicle the commission shall take into consideration exist-

ing transportation facilities in the territory for which a certificate is sought, and in case it finds from the evidence that the service furnished by existing transportation facilities is reasonably efficient and adequate, the commission shall not grant such certificate".

Provisions of the Motor Carrier Act, quoted above, we think, make it clear that before the applicant railway company can transport any less than carload freight over the highways of this State by motor truck, it must obtain authority from the Public Service Commission to do so. We do not understand that the applicant here contends otherwise. It is readily conceivable, however, that the granting of such a certificate and the vesting of such authority in the Public Service Commission are necessary for the proper supervision and regulation of all common carriers of property using the highways of this State, without any relation to the basis for or the requirements necessary for the issuance of such certificate. In other words, the fact that such a certificate is required does not necessarily mean that proof in every case must be to the same effect to authorize the issuance of such a certificate. The purpose for which authority is sought should determine the nature of the proof required, unless in violation of some statutory provision.

Another preliminary question argued at considerable length by protestants relates to the weight to be given by this Court to findings of fact by the Public Service Commission. In *Bluefield Telephone Company* v. *Public Service Commission,* 102 W. Va. 296, 135 S. E. 833, this Court held, Point 1, syllabus: "An order of the Public Service Commission will not be annulled by this court unless the order manifests unlawful, arbitrary or capricious exercise of power. Judicial review should extend no further than is necessary to keep the Commission within the law, and protect the Constitutional rights of the corporations which it controls." Indeed, it may be questioned whether this Court has jurisdiction to disturb a finding of fact by the Public Service Commission where it is supported by substantial evidence. See Article V,

Constitution of West Virginia, dealing with separation of the three departments of government. *State ex rel. Richardson* v. *County Court of Kanawha County,* 138 W. Va. 885, 78 S. E. 2d 569. We think, however, regardless of the extent of the rule, that it has no application in a case where the finding has no material relation to the issue of fact determinative of the question involved.

It is the position of applicant that the Motor Carrier Act, properly applied, does not require that there be proof of inadequacies in existing service where one of the existing common carriers applies for a certificate of convenience authorizing only a supplemental, auxiliary or coordinated method of rendering the service required of it, and that the Public Service Commission is required to issue a certificate of convenience and necessity for such supplemental, auxiliary or coordinated service where it is established that the additional or new method of service will substantially better the service being rendered to the advantage of that part of the public then being served, and which will result in substantial savings to the applicant, especially where the service is a specialized service, different from that being furnished by any other carrier. Protestants contend that no such certificate of convenience and necessity may be issued unless it be established to the satisfaction of the Public Service Commission that inadequacy exists as to the service being furnished by the carrier or carriers then operating within that particular field. The holding of the Public Service Commission was in accord with the contention of protestants.

The precise point has not been considered in this State. Apparently the only states having statutory provisions similar to the applicable provisions of the Motor Carrier Act are Virginia and Ohio. Protestants rely heavily on the Virginia case of *Seaboard Air Line Railroad Company* v. *Commonwealth,* 193 Va. 799, 71 S. E. 2d 146. In that case the applicant sought authority to operate a truck service, in coordination with its rail service, of less than carload freight, between Norfolk-Portsmouth, Virginia, and the Virginia-North Carolina state line, near Branchville, Vir-

ginia. In that case, "In the hearing before the Commission, the Applicant presented no testimony to show what the public needs are as to the service it proposes to provide in its application or that public convenience and necessity required that service. Instead, it relied upon the testimony of its Division Superintendent and its Assistant General Manager to the effect that (1) the Railroad will effect economies if the truck operation is authorized; and (2) some shipments now moving by rail could be handled more expeditiously and efficiently by truck, resulting in some cases in earlier delivery to the consignee * * *". It is also pointed out in the opinion in that case, not in accord with the facts in the instant case, "* * * that no shipper or receiver of freight, or any other party within the area sought to be served, has appeared to express a preference or desire that such service be inaugurated * * *". Here there is no question that the evidence establishes that the proposed supplementary service would result in a better service to that part of the public electing to use the railway common carrier service. It is no answer to say that such service may be otherwise available. Applicant operates under proper authority, is one of the present operators in the Kanawha District, and is entitled, in fact should be required, to furnish services commensurate with modern day demands. Many of the protestants admit, with commendable candor, that the auxiliary truck service will result in a much better service for all of those electing to use the railway service. The better or auxiliary service will not result merely to "some" of the shippers, but to all shippers and receivers of not only less than carload freight, and also to shippers and receivers of carload freight, by making possible the more efficient handling of freight and coal trains by the applicant. Moreover, the facts detailed above establish that the applicant seeks not authority for a new or extended service, but for a different method only of rendering a specialized and limited service it is already authorized and required to render, and which is rendered by no other carrier.

Clearly, we think, the controlling facts in the instant case are materially different from the facts in the *Seaboard Air Line Railroad Company case.* If, however, the facts in that case are to be considered as being to the same effect as the facts in the instant case, as protestants contend, this Court is not inclined to follow the rule announced therein. It may be of interest to note that the Interstate Commerce Commission has granted authority to Seaboard to operate a substitute motor truck service as to interstate freight of less than carload along the route involved in the *Seaboard Air Line Railroad Company* case, and that like authority as to the intrastate freight has been granted to Seaboard along its line within North Carolina, as noted in the opinion just referred to.

As above noticed, the applicable statutory provisions of Ohio are to the same general effect, if not precisely so, as the West Virginia Motor Carrier Act. The precise point involved in the instant proceeding was considered by the Ohio Court in a case where a certificate for such substitute auxiliary service was granted by the Ohio Public Utilities Commission, *Norwalk Truck Line Co.* v. *Public Utilities Commission of Ohio,* 148 O. St. 247, 74 N. E. 2d 328. In the opinion the Court stated:

"The protestants contend that the records do not show public convenience and necessity for the proposed services. In both cases testimony of shippers and railroad officials shows that at least two or three days will be saved in the shipment of less than carload lots; that the services will release railroad equipment for other uses; and that operating economies will be afforded to the railroads. In the opinion of this court, the commission had adequate evidence warranting the granting of the certificates of public convenience and necessity.

"Protestants contend that it was error for the commission not to give them sixty-day notices to furnish the proposed services. Here we have proposed services which are specialized and different from existing services. This court has held many times that, where such a service is

proposed, a certificate of public convenience and necessity may be granted without first affording existing transportation companies an opportunity to provide such service * * *". To the same effect are *B. & N. Transportation* v. *Public Utilities Commission,* 153 O. St. 441, 92 N. E. 2d 265; *Cleveland, Columbus & Cincinnati Highway, Inc.* v. *Public Utilities Commission,* 144 O. St. 557, 60 N. E. 2d 166; *H. & K. Motor Transportation* v. *Public Utilities Commission,* 135 O. St. 145, 19 N. E. 2d 956.

In *H. & K. Motor Transportation* v. *Public Utilities Commission, supra,* the Court held: "4. Where the public convenience and necessity demand a specialized type of motor transportation service of a kind and character different from that afforded by motor transportation companies already operating under certificates over the same route, a certificate of public convenience and necessity may issue to a motor transportation company limited to such specialized service without first affording such other motor transportation companies an opportunity to furnish such specialized and limited service, and especially so if the specialized or limited service has been organized and built up by the applicant through the means of other transportation facilities, the use of which have been closed to it by abandonment". This holding was approved in *Cleveland, Columbus & Cincinnati Highway; Inc.* v. *Public Utilities Commission, supra.*

In the *B. & N. Transportation* case the Court pointed out: "It should be remembered that the applicant was serving all the communities concerned in the instant cases years before there was any such thing as motor transport service, and, although motor transport service is highly desirable and beneficial when carried on in the public interest, the benefits of it should be enjoyed by railroads when those benefits can be ordered without violating the law and where they are in the public interest. It is to the public interest that railroads be afforded reasonable and lawful opportunities to effect economies and to im-

prove service to shippers and receivers along railroad lines."

The reasoning of the United States Supreme Court is in accord with that of the Ohio Court. In *Interstate Commerce Commission* v. *Parker*, 326 U. S. 60, 89 L. ed. 2051, 65 S. Ct. 1490, the Court said:

"The contention of appellees, protestant motor carriers, is that since no evidence was offered as to the inadequacy of the presently duly certificated motor carriers to serve the railroad's need, there was a failure of proof as to convenience of and necessity for a new motor truck operation in the territory. Public convenience and necessity should be interpreted so as to secure for the Nation the broad aims of the Interstate Commerce Act of 1940. Cf. New England Divisions Case (Akron, C. & Y. R. Co. v. United States) 261 US 184, 189, 67 L ed 605, 609, 43 S Ct. 270; Interstate Commerce Commission v. Railway Labor Executives Asso. 315 US 373, 376, 377, 86 L ed 904, 907, 908, 62 S Ct. 717; United States v. Lowden, 308 US 225, 230, 84 L ed 208, 213, 60 S Ct. 248; *Texas & N. O. R. Co.* v. *Northside Belt R. Co.* 276 US 475, 479, 72 L ed 661, 663, 48 S Ct. 361. In protestant's view a certificate of convenience and necessity should not be granted to railroads for motor truck operation when existing motor carriers are capable of rendering the same service. Appellants take the position that this precise issue need not be decided in this case. They look upon the application as asking for authority to improve 'an existing service.' We think that it was for a motor service to improve an existing rail service. Consequently, the issuance of the certificate is subject to all the requirements of any other application for a certificate for operation of motor lines. Since, however, on adequate evidence the Commission found that the motor service sought was of a different character from the existing motor service and not directly competitive or unduly prejudicial to the already certified motor carriers, 42 MCC (F) 725, 726, we hold that the Commission had statutory authority and administrative

discretion to order the certificate to issue. The public is entitled to the benefits of improved transportation. Where that improvement depends in the Commission's judgment upon a unified and limited rail-truck operation which is found not 'unduly prejudicial' to motor carrier operations, the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service.

"Certificates of the general character of the one proposed by the Commission for Willett have been granted heretofore. The motor service was not the normal over-the-road type but restricted to services auxiliary or supplemental to the rail service * * *".

In *Thomson* v. *United States*, 321 U. S. 19, 88 L. ed. 513, 64 S. Ct. 392, the Court stated:

"The essential facts are clear. The Chicago and North Western Railway Company, hereinafter referred to as the railroad, has extensive mileage in nine western states and is a large carrier of freight in less than carload lots. Prior to and since the statutory 'grandfather' date of June 1, 1935, it has supplemented its rail freight service by providing motor vehicle service between various freight stations on its rail lines. There are twenty-three such motor vehicle routes on highways parallel with and roughly adjacent to the railroad's lines. The motor trucks transport less than carload lots of freight in complete coordination with the rail service. The railroad instituted this additional method of transportation in order to furnish an improved and more convenient freight service to the public in certain areas of light traffic and in order to curtail car mileage and way-freight service. Motor vehicle transportation, in other words, is merely a new method of carrying on part of its all-rail freight business in which it has been engaged for many years."

The Interstate Commerce Commission consistently grants such authority, as to interstate less than carload freight, in situations where the facts are comparable to the facts in the instant case. See *Rock Island Motor*

*Transit Company Extension,* 51 M.C.C. 728; *Santa Fe Trail Transportation Company Extension,* 48 M.C.C. 85; *Reading Transportation Company Extension,* 47 M.C.C. 225; *Seaboard Air Line Railroad Company Extension,* 47 M.C.C. 433; *Dohrn Transfer Company* v. *Rock Island Motor Transit Company,* 47 M.C.C. 791; *Missouri Pacific Railroad Company and Missouri Pacific Railroad Corporation in Nebraska Extension,* 46 M.C.C. 660; *Greenbay and Western Railroad Company,* 44 M.C.C. 401; *Chicago and North Western Railway Company,* 44 M.C.C. 333; *Willett Company of Indiana Extension,* 44 M.C.C. 283; *Atlantic Coast Line Railroad Company Extension, Va. & N. C.,* 30 M.C.C. 490; *Seaboard Air Line Railway Company,* 17 M.C.C. 413.

While it is true that the Public Service Commission of West Virginia must look to the statutes of this State, not to the Acts of Congress relating to interstate commerce, as the Interstate Commerce Commission and Federal Courts do, cooperation in handling problems arising in connection with transportation of interstate and intrastate freight is desirable, in the best interests of the public. To require duplication of essential services would incur unnecessary expense that would necessarily be reflected in tariff rates, paid by the public and, in some cases, at least, would probably stifle commerce. If the statutes of the State relating to transportation of freight by common carriers are not in conflict with Acts of Congress, they should be considered together in determining what constitutes the best interests of the public in the regulation and supervision of such businesses. Section 5 of Article 5 of the Motor Carrier Act provides that the Public Service Commission shall: " (h) Cooperate with the federal government and the interstate commerce commission of the United States or any other commission or organized delegated authority to regulate interstate or foreign commerce by motor vehicles, and it shall be its duty so to do, to the end that the transportation of persons and property by motor vehicles in interstate and foreign commerce into and through the State of West Virginia may be regulated and the laws of the United States and of the State of West

Virginia enforced and administered cooperatively in the public interest."

In *Princeton Power Company* v. *Calloway*, 99 W. Va. 157, 128 S. E. 89, this Court stated: "The policy of the state as evidenced by * * * the statutes relating to the public service commission, its powers and duties, is not to invite or encourage ruinous competition between public carriers; on the contrary its policy is to protect such public servants in the enjoyment of their rights, so that the public may be served most efficiently and economically, and by the best equipment reasonably necessary therein. As illustrative of the application of this power respecting public carriers, see *Chesapeake & Ohio Ry. Co.* v. *Pub. Ser. Com.*, 75 W. Va. 100; Id. 78 W. Va. 667." See *Atlantic Greyhound Corporation* v. *Public Service Commission*, 132 W. Va. 650, 54 S. E. 2d 169; *Reynolds Transportation Company* v. *Public Service Commission*, 125 W. Va. 690, 26 S. E. 2d 519. *McKee and McDonald* v. *Public Service Commission*, 124 W. Va. 10, 18 S. E. 2d 577. If the State "is to protect such public servants in the enjoyment of their rights, so that the public may be served most efficiently and economically", it should not assist in the economic strangulation of one of the public servants by refusing to permit improvement in methods of performing the very business it was authorized to do.

Admittedly, some of the language used in the decisions of this Court, cited above, when considered apart from the facts of the case in which found, furnishes basis for the contention that no certificate of convenience and necessity should be granted where proof does not establish inadequacy of existing authorized service. Those cases, however, deal with situations where new carriers seek authority in the field of operations, or where authorized carriers seek to enter new fields, not where one already authorized to do business in a certain field applies for authority as to a new method of rendering a specialized and limited service it is already authorized and required to render. We say here, in the language of the United

States Supreme Court, found in the *Parker* case, "The motor service was not the normal over-the-road type but· restricted to services auxiliary or supplemental to the rail service", or, as stated in the *Thomson* case, "Motor vehicle transportation, in other words, is merely a new method of carrying on part of its all-rail freight business in which it has been engaged for many years." Can there be any logical basis for requiring a common carrier to prove inadequacy of a service it is itself helping to render, where it seeks to improve that service, to the advantage of the public, and at a substantial savings to the common carrier, unless some statutory provision clearly requires such proof?

We necessarily conclude that the factual question relating to inadequacy of the service being rendered by the common carriers of property in less than carload, within the Kanawha District, is not material in the determination of the right of applicant in this proceeding, and that proof of such fact should not be required or considered in determining whether the authority sought should be granted. The applicable provisions of the Motor Carrier Act do not require such proof where, as here, the authority sought is merely for the privilege of rendering a more efficient specialized service by a new method, by a common carrier authorized to render such service.

What has been said applies to the further contention of protestants to the effect that a common carrier is entitled, under provisions of the Motor Carrier Act, to an opportunity to improve an inadequate service before the granting of any further authority as to operations within the same field. Obviously, if the question of inadequacy of the existing service being rendered is not material, an opportunity to remedy the existing service need not be afforded.

Thus far we have considered the controlling question as we believe it to be governed by provisions of the Motor Carrier Act. Another statute forces us to the same conclusion. Article 2 of Chapter 31, Code, deals with "Railroad

Companies". Section 1 of that article, in so far as pertinent, reads: "Every railroad company * * * is a common carrier, and is authorized to acquire * * * own, maintain, operate * * * railway lines, plants and systems, and any and all other suitable facilities for, and to engage in transporting persons and all commodities, objects and things which are subjects of commerce or of transportation by any and all means and methods, which are now used, or which may hereafter be developed". Notice the significance of the language permitting railroad common carriers to transport all subjects of commerce "by any and all means and methods, which are now used, or which may hereafter be developed". Apparently this statute is based upon Section 9 of Article XI of the State Constitution. In its present form it first became effective with the adoption of the 1931 Code, and has not since been amended. It is here contended, however, that it has been repealed by the Motor Carrier Act. Section 2 of Article 8 of that Act expressly repeals certain other designated statutes, and contains this further provision. "* * * and the provisions of any other act of said legislature, or Code of West Virginia, one thousand nine hundred thirty-one, as amended, which is inconsistent with the provisions of this chapter, are hereby expressly repealed". If the provisions of Code, 31-2-1, quoted above, have been repealed by that section or by implication, the repeal must have resulted from an irreconcilable conflict between those provisions and provisions of the Motor Carrier Act. We think it clear that the Motor Carrier Act was not intended to proscribe all rights and duties of railroad common carriers. The provisions of the Act, quoted above, evince clear intent on the part of the Legislature to repeal only any "inconsistent" statutory provisions, not to repeal all prior statutory provisions relating to rights and duties of railroad common carriers.

Undoubtedly, provisions of the Motor Carrier Act do vest in the Public Service Commission the power to issue certificates of authority and regulate and supervise the business of railway common carriers, as pointed out above.

The granting of such power, however, is not necessarily in conflict with the specific privilege accorded a railway in the method of conducting its business. Most certainly the Legislature could not have intended that the granting of the authority, or that the regulation and supervision should be accomplished by the Public Service Commission in violation of some legislative command. The only other enactment upon which the repeal of the provisions of Code, 31-2-1, could be based rests upon provisions found in the Motor Carrier Act, quoted in this opinion. In such provisions we find nothing in conflict therewith. All that is required to be done by the Motor Carrier Act can be done effectively whether Code, 31-2-1, has been repealed or whether it remains a part of the statutory law of this State. Code, 31-2-1, and the Motor Carrier Act, may be read *pari materia,* and when so read form a definite, workable pattern for operations. We hold, therefore, that no repeal thereof has been effected by the enactment of the Motor Carrier Act, expressly or by implication. Repeal of a statute by implication is not favored. To effect repeal of a statute by implication there must exist an irreconcilable conflict between it and the subsequent enactment, unless it clearly appears that the later enactment was intended to supersede all other statutes relating to the subject matter. In *Beck* v. *Cox,* 77 W. Va. 442, 87 S. E. 492, this Court held: "3. Repeals by implication do not occur except in two instances, a statute plainly intended as a substitute for all previous law pertaining to its subject matter, on the one hand, and irreconcilable repugnancy, on the other. In the latter case, the new act is amendatory and repeals the old only to the extent of such repugnancy." See *Harbert* v. *County Court of Harrison County,* 129 W. Va. 54, 39 S. E. 2d 177; *United States Coal and Coke Company* v. *Loan Company,* 127 W. Va. 368, 33 S. E. 2d 463.

The language of Code, 31-2-1, is clear and definite, and we perceive no difficulty in the application thereof. It is common knowledge that in the early days of the development of this country the Federal Government, and most

of the state Governments, extended special grants or privileges to railroad companies in an effort to further such development. Questions as to whether such policy should be continued, or whether railroad companies, as common carriers, are entitled to certain privileges because of the enormous amounts of money expended by them in the construction of railroads and purchase of facilities, or because of the continued necessity for their existence and operations, are questions for legislative determination. The function of courts is to apply the law, not to enact or repeal statutes.

We have not failed to give consideration to the contention that the proposed substitute service will enable the applicant to compete unfairly with other carriers operating within the same area. We think, however, that that question is not necessarily here involved. If unfair competition or practices occur and are established by subsequent records before the Public Service Commission, ample authority is vested in that body to enter any necessary order to prevent such practices, even to the revocation of any certificate of authority granted. Motor Carrier Act, Article 2, Section 5.

The question arises as to whether there should be imposed upon any authority granted any key point restrictions, or any requirements as to prior or subsequent rail shipments. We think the language used by Mr. Justice Reed in the *Parker* case states strong and cogent reasons for not imposing any such restrictions. That language follows: "* * * In order to restrict motor carriers, which were operated by railroads to this coordinated service, the Commission customarily inserted a provision in the order granting the application that the motor shipments must have prior or subsequent movement by rail. E.g. Re Kansas City S. Transport Co. 10 MCC(F) 221, 240. The rail carriers pointed out, however, that this restriction interfered with the efficiency of their operations, since commodities might be offered them at one-way station for transportation to another way-station within ordinary motoring distance. In such a case a way-freight

train would be required. It was to meet this situation that the key-point or break-bulk rule, which is employed here, was developed. Re Kansas City S. Transport Co. 28 MCC (F) 5, 9, 11, 22, 25.

"This key point requirement is one factor of differentiation between this certificate and the normal over-the-road motor certificate of convenience and necessity. Other differentiations are found in the limitation of service to rail station points and the condition that the Commission reserved the right to impose such other requirements as might be found necessary to restrict the rail subsidiary to coordinated rail service instead of permitting general competition with motor carriers in over-the-road service".

. In oral argument it was pointed out that applicant now operates, in connection with its present authority, what is commonly referred to as a pick-up service at Huntington and Charleston, and it was contended that such pick-up service, if extended, would result in ruinous or destructive competition, at least as to certain of the motor carriers involved. The purpose of the authority sought, however, is not to enable applicant to extend its present field of operations. Neither is it the purpose of the authority sought to limit the operations of applicant as to the rights it now has or the methods it now uses in rendering the service it.is now authorized to render. On remand, the Public Service Commission may impose any reasonable restrictions by it deemed necessary in the public interest to authorize or require applicant to operate within the authority granted. Motor Carrier Act, Article 2, Section 5.

During the course of the hearing, applicant was permitted to amend its application, seeking further authority to handle railway express in its truck operation, in the handling of less than carload freight, between its freight station at Charleston and certain other named railway stations within the Kanawha District. The record does not indicate any intention on the part of any protestant to oppose the granting of such additional authority, in

the event of the granting of authority to operate the substitute service. The Public Service Commission did not pass upon this question. The question is left open for initial consideration by the commission.

Applicant, at the Public Service Commission hearing, indicated its willingness, upon the granting of the authority sought, to operate as owner the proposed truck service, or to lease such operations to some responsible person, satisfactory to the Public Service Commission, as the commission might order. This question also is left open for initial consideration by the commission.

From what has been said, it necessarily follows that the final order of the Public Service Commission of West Virginia must be affirmed, in so far as it holds that the Motor Carrier Act vests authority in the Public Service Commission to grant the certificate of convenience sought by the applicant; that such order must be reversed, in so far as it denies the right of applicant to the certificate of convenience; and that this proceeding must be remanded to the Public Service Commission with directions that such certificate be granted, with the imposition of such conditions and restrictions as deemed by the Public Service Commission to be necessary or proper in the public interest, in accord with the conclusions reached in this opinion.

*Affirmed in part;*
*reversed in part;*
*remanded with directions.*

BROWNING, JUDGE, dissenting:

I dissent from the decision of the Court in this case, and would affirm the order of the Public Service Commission in denying the application of the railway company.

There are two controlling issues involved in the Court's decision, and I am in disagreement with its position as to both. The first concerns the interpretation of Code, 31-2-1, and the second, the Court's holding as a matter of law that

the applicant by his application seeks only to engage in a specialized, limited service in the transportation of freight in less than carload lots.

The pertinent provisions of Code, 31-2-1, are quoted in the Court's opinion, and I am concerned with the statement therein that the provisions of the Motor Carrier Act have not superseded the broad transportation privileges accorded railroad companies by that section. If railroad companies still have the authority "to engage in transporting persons and all commodities, objects and things which are subjects of commerce or of transportation by any and all means and methods, which are now used, or which may hereafter be developed.", unhampered and unlimited by the provisions of the Motor Carrier Act, except for the formality of securing a certificate from the Public Service Commission so that the latter may routinely supervise the activities of such companies, all others engaged in the transportation of persons and commodities in this State are placed in a most hazardous position. It is my opinion that the language used in Chapter 24-A, the Motor Carrier Act, clearly shows the intent of the Legislature to limit the broad powers granted railroad companies by the ancient statute. The Act clearly shows a complete and comprehensive system of economic regulations for all who would transport persons and property over the highways of this State, a system not contemplated at the time of the original adoption of what is now Code, 31-2-1.

Section 2 of Article 1 of the Motor Carrier Act specifically provides that the term "common carrier by motor vehicle" includes "such motor vehicle operation of carriers by rail * * *." While there can be no disagreement with the position of the Court, as stated in its opinion, that the repeal of a statute by implication is not favored, the principle that a new Act repeals an earlier one, where there is an "irreconcilable repugnance" to the extent of such repugnancy is equally well established. *Beck* v. *Cox,* 77 W. Va. 442, 87 S. E. 492, and other decisions of this Court cited in the majority opinion.

It is my position that railroad companies are either subject absolutely, as are all others, to the provisions of the Motor Carrier Act, with regard to transportation of persons and commodities upon the public highways of this State, or they are not subject to the provisions at all. If this Court has held in this case that railroad companies are not subject to the provisions of the Motor Carrier Act, or, if so, then only for the formal purpose of accepting the regulatory provisions of that Act, and the Public Service Commission is without authority to deny such companies permission to engage in such transportation upon the highways of this State, a most serious constitutional question is thereby presented. It is my opinion that railroad companies have no superior rights to others engaged in transportation upon the highways of this State, and that the provisions of the Motor Carrier Act, in clear and unambiguous language, so state. If there is a conflict between the provisions of that Act and the old railroad statute, the limitation of the former must, and does, supersede the provisions of the latter.

The Court has also erroneously determined, in my opinion, that the application of the applicant and the record made in the hearing before the Public Service Commission show that the applicant is engaged in a specialized, limited service which exempts it from making the showing required by the Motor Carrier Act for the issuance of a certificate to transport commodities as a common carrier by motor vehicle over the routes designated in the application. It must be observed that this applicant, seeking to transport commodities, in less than carload lots, by motor vehicles, asks permission to render this service "without limitation". In other words, the applicant specifically refused to limit its application to the transportation of commodities involving prior or subsequent shipment by rail, and likewise refused to be limited by so-called "key point" restrictions. While it is true that the Court's opinion states "that this proceeding must be remanded to the Public Service Commission with directions that such certificate be granted, with the

imposition of such conditions and restrictions as deemed by the Public Service Commission to be necessary or proper in the public interest, * * *", the position of the Court, as stated in its opinion, is such that the Public Service Commission can have little discretion in imposing restrictions upon the applicant that will not be inconsistent with the views expressed by this Court. It is my position that if conditions and restrictions are to be applied by the Public Service Commission, that its ruling in this proceeding should be affirmed, and the applicant required to file a new application so that the hearing would produce evidence pertinent to the conditional application, rather than to require the Commission to attempt to impose restrictions upon a record made upon the sole issue of whether a certificate should be issued without limitations of any kind. If the applicant and other railroad companies are required to submit to the provisions of the Motor Carrier Act, as I believe they are, then I can not escape the conclusion, from a review of the evidence produced at the hearing before the Commission, that the eligibility of the applicant for the certificate which it sought was a question of fact.

The principal test as to whether the applicant was to engage in a motor carrier service that was distinctive from, and more limited than, such services being rendered by others, was a question of fact as to whether the one would be in competition with the other. A large volume of testimony was adduced upon this question, and certainly the decisions of this Court are uniform in holding that a finding of fact by the Public Service Commission will not be disturbed if supported by substantial evidence. The second syllabus point of the Court's opinion, quoting from the *Bluefield Telephone* case, is illustrative of the Court's position as to that question.

Subsection (a) of Section 5, Article 2 of the Motor Carrier Act, which is quoted in full in the Court's opinion, requires an applicant for a certificate of convenience and necessity, not only to make a showing of such public convenience and necessity, but to affirmatively show that

any common carrier holding such a certificate, over any of the routes where the new applicant seeks to operate, is not providing adequate service. The holder of such certificate shall have reasonable time and opportunity to remedy the inadequacy or insufficiency before any certificate shall be granted to the new applicant seeking to operate over such route or routes. There is no evidence in this record to justify a conclusion that the present carriers were not rendering such service over the routes where the applicant sought to operate, but the applicant, refusing to attempt to produce evidence to that effect, relied upon its contention that such was not required where a certificate was sought for a specialized, limited service, and this Court sustained its position in that regard. It is my opinion that the very question of· whether the applicant was to engage in a service that exempted it from making this showing was a question of fact, and ·that factual question having been determined by the Commission, this Court is not at liberty to disturb it, in the absence of a showing that such order manifests unlawful, arbitrary or capricious exercise of power.

As stated in the Court's opinion, the only states which have a "protective clause" in their acts, similar to ours, are Ohio and Virginia. There is no such provision in the Federal legislation which governs the activities of the Interstate Commerce Commission. The decisions of the Federal courts, therefore, are not applicable, although it is to be noted that even in the absence of such a clause in the Federal legislation, those courts have applied the principle in granting certificates, and have uniformly protected the old certificate holders by proper limitations in certificates granted to new applicants, including key point, and prior or subsequent rail transportation in applications for certificates for motor vehicle transportation by railroad companies where such privilege is sought as an auxiliary to rail service.

The Ohio decisions discussed in the Court's opinion involve cases in which the commission was affirmed by the Supreme Court of that State in issuing such certificates

upon a factual determination of a lack of harmful competition, or where stringent limitations were placed upon the applicants. The only case directly in point is the Virginia case of *Seaboard Air Line Railroad Company* v. *Commonwealth,* which is discussed in the Court's opinion. In that case, where the pertinent factual situation can not, in my opinion, be distinguished from that in this case, the commission was affirmed by the Supreme Court of Virginia in denying the application of the railroad company to operate a trucking service paralleling its rail line.

I would affirm the order of the Public Service Commission in its entirety, and I am authorized to say that Judge Riley is of similar opinion, and concurs in this dissent.